In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-4036

CAROL A. GLASER,

*Plaintiff-Appellant,*

*v.*

WOUND CARE CONSULTANTS, INCORPORATED,
MELISSA E. MILLER, and DR. STEVEN MILLER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 C 573—**Larry J. McKinney**, *Judge.*

ARGUED APRIL 15, 2008—DECIDED JULY 2, 2009

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Carol Glaser received medical treatment from Wound Care Consultants and was later contacted by an attorney who told her that Wound Care might have improperly billed Medicaid for her treatment. She filed this qui tam action under the False Claims Act ("FCA"), 31 U.S.C. § 3730, seeking recovery as a relator for money the government paid as a result of

alleged false or fraudulent Medicare and Medicaid claims submitted by Wound Care. But the government was already aware of the possible improprieties in Wound Care's billing practices and had commenced an investigation more than four months before Glaser filed her lawsuit. Accordingly, the district court dismissed Glaser's complaint for lack of subject-matter jurisdiction under 31 U.S.C. § 3730(e)(4), which blocks jurisdiction if the FCA action is "based upon" a "public disclosure" of the alleged fraudulent conduct "unless . . . the person bringing the action is an original source of the information." Glaser appealed.

The threshold jurisdictional question in this case requires us to determine whether Glaser's lawsuit is "based upon" a "public disclosure" of Wound Care's alleged fraudulent billing practices. We take this opportunity to revisit our prior interpretation of the phrase "based upon" in § 3730(e)(4)(A). In *United States v. Bank of Farmington*, we held that an FCA lawsuit is "based upon" a public disclosure and therefore subject to the jurisdictional bar of § 3730(e)(4) when the lawsuit "depends essentially upon publicly disclosed information and is actually derived from such information." 166 F.3d 853, 864 (7th Cir. 1999). Although we reaffirmed the *Bank of Farmington* holding in *United States ex rel. Fowler v. Caremark RX, L.L.C.*, we acknowledged that it is the minority interpretation. 496 F.3d 730, 738 (7th Cir. 2007). To date, eight other circuits have read the phrase "based upon" in § 3730(e)(4)(A) more broadly, holding that an FCA lawsuit is "based upon" a public disclosure when the relator's complaint describes allega-

tions or transactions that are substantially similar to those already in the public domain.

We now conclude that the majority interpretation of the phrase "based upon" in the FCA's jurisdictional bar—which we acknowledged in *Caremark* was supported by "powerful arguments," 496 F.3d at 738—is the better one. The approach we adopted in *Bank of Farmington* is problematic because it essentially eliminates the "original source" exception to the public-disclosure bar and therefore upsets the balance struck in § 3730(e)(4) between two competing policy goals: blocking opportunistic lawsuits filed by plaintiffs seeking to capitalize on information already in the public domain and encouraging lawsuits by relators who have firsthand knowledge of fraud against the government.

When an FCA relator's allegations are substantially similar to information about an alleged fraud that is already publicly disclosed, the statute permits the relator to avoid the jurisdictional bar only if he has "direct and independent knowledge of the information on which the allegations are based" and "voluntarily provided the information to the Government before filing" a qui tam action. 31 U.S.C. § 3730(e)(4)(B). Yet under *Bank of Farmington*'s understanding of when an FCA lawsuit is "based upon" publicly disclosed information, the original-source exception serves no purpose. That is, if the jurisdictional bar kicks in only if the allegations in the relator's lawsuit are *actually derived from* a public disclosure, there is no point in asking whether

the relator was an original source of the information—he cannot be. Under our present approach, the entire original-source inquiry—asking whether the relator had "direct and independent knowledge" of the information and "voluntarily provided" it to the government—is superfluous. Accordingly, we overrule the interpretation adopted in *Bank of Farmington* and *Caremark* and hold that an FCA relator's complaint is "based upon" publicly disclosed allegations or transactions when the allegations in the relator's complaint are substantially similar to allegations already in the public domain.[1]

Applying this standard to Glaser's case, we affirm the district court's application of the jurisdictional bar. Allegations that Wound Care was improperly billing Medicare and Medicaid for services performed by physician's assistants were publicly disclosed in early 2005 when the government notified Wound Care that it was investigating these billing practices. Glaser's complaint is based on this publicly disclosed information in that her allegations of fraudulent billing are substantially similar to those the government had already lodged against Wound Care in its investigation. Glaser cannot show she is an original source of the allegations in her complaint because she learned about Wound Care's alleged fraudulent billing from her attorney and then asserted the

---

[1] Because this decision overrules prior decisions of this court, pursuant to Circuit Rule 40(e), we have circulated it among all judges in regular active service. No judge has requested to hear the case en banc. Circuit Judge John Daniel Tinder did not participate in the consideration of this case.

attorney-client privilege to avoid divulging how her attorney learned of this information. The district court properly dismissed Glaser's complaint for lack of subject-matter jurisdiction.

## I. Background

Both Medicare and Medicaid comprehensively regulate how health-care providers may obtain reimbursement for services provided by physician's assistants. There are some differences in the regulatory framework for each program, reflecting the fact that Medicare is administered at the federal level by the Department of Health and Human Services and is applied uniformly throughout every state while Medicaid programs are administered at the state level according to rules each state promulgates. We can simplify our analysis in this case by assuming that the general rule under these programs is that physician's assistants must bill Medicare and Medicaid at a lower rate for the work they do than if the same work had been performed by a doctor. However, a health-care provider may use a doctor's identification number to bill Medicare and Medicaid for services performed by a physician's assistant—and thus obtain reimbursement at the doctor's rate—if the assistant rendered services "incident to" the services of a physician. Most relevant for purposes of this case, an assistant's services are "incident to" a physician's services only if the doctor directly supervises the assistant's performance.

Dr. Steven Miller and Melissa Miller own Wound Care Consultants, which, as its name indicates, provides wound-

care services. In January 2005, nearly four months before this lawsuit was filed, a medical-review nurse with the federal Centers for Medicare & Medicaid Services ("CMS") contacted Wound Care to discuss billing irregularities that had been identified in a routine agency audit. According to a March 2005 letter from CMS,[2] Wound Care allowed an advanced registered nurse practitioner to use Dr. Miller's identification number to bill Medicare at a higher rate—therefore representing that the nurse practitioner's services were "incident to" the services of a physician—even though Dr. Miller did not supervise the nurse practitioner's activity. CMS eventually expanded its audit to review all Medicare claims submitted using Dr. Miller's identification number. From March 2005 to December 2006, CMS periodically sent letters asking Wound Care to repay funds it received at the higher doctor's rate rather than at the lower assistant's rate. Wound Care claims it repaid everything CMS asked it to.

The relator in this case, Carol Glaser, is a Medicaid recipient with post-polio syndrome, respiratory failure, and arthritis. As a result of her conditions, Glaser had numerous wounds that required treatment. Beginning in 2002, Glaser obtained wound-care services from Wound

---

[2] Technically, the letter was sent by AdminaStar Federal (which has since changed its name to National Government Services). But because AdminaStar contracted with CMS to administer the Medicare program, a responsibility that includes identifying and addressing billing errors, we refer to AdminaStar's investigation as a CMS investigation.

Care on at least 12 occasions, and she says each treatment was provided by a physician's assistant. Glaser never saw how Wound Care billed Medicaid, and she remained oblivious to Wound Care's billing practices in general until her attorney in this case, Mary Lapointe, contacted her.[3]

We have no idea how Lapointe learned of Wound Care's billing practices because both Glaser and Lapointe have invoked the attorney-client privilege to avoid revealing Lapointe's source. We do know that these conversations inspired Glaser to file this suit against Wound Care under the FCA in April 2005. The complaint alleged that Wound Care recorded Glaser's treatments as having been performed by a physician's assistant "incident to" Dr. Miller's services. This practice was fraudulent, Glaser asserted, because Dr. Miller was not on the premises when Glaser received treatment and therefore could not have directly supervised the assistant's performance.

The government declined to intervene, and Wound Care moved to dismiss Glaser's suit for lack of subject-matter jurisdiction under 31 U.S.C. § 3730(e)(4) because it was

---

[3] We do not know when Lapointe first contacted Glaser. Glaser was deposed on June 7, 2007. During her deposition, she testified that she first became aware of potential billing improprieties "[p]robably a year and a half ago," which would be around December 2005. This is almost certainly wrong because her qui tam action was filed in April 2005 and government officials interviewed Glaser in May 2005. The record is otherwise silent as to when Glaser learned about Wound Care's improper billing practices from Lapointe.

"based upon the public disclosure of allegations or transactions" and Glaser was not an "original source" of CMS's investigation. Glaser testified that she had no knowledge of Wound Care's billing practices until Lapointe contacted her, and neither Glaser nor Lapointe have revealed how Lapointe learned of Wound Care's allegedly fraudulent billing practices. Glaser and Lapointe nevertheless told the district court that they had no knowledge of the CMS investigation when Glaser filed her complaint; in Glaser's view this was enough to show that her claim was not "based upon" publicly disclosed information because it was not "derived from" the CMS audit.

The district court disagreed and dismissed Glaser's suit. The court noted that when Glaser filed her suit, CMS had already launched an inquiry into the same billing practices that formed the basis of Glaser's lawsuit. The district court also concluded that because Glaser testified that all her knowledge of Wound Care's billing practices came from her attorney and because Glaser refused to say how her attorney learned of the billing irregularities, Glaser had failed to prove that the lawsuit was not "based upon" a public disclosure or that she was an "original source." The district court denied Glaser's motion for reconsideration and Glaser appealed.

## II. Discussion

We review de novo the district court's dismissal for lack of subject-matter jurisdiction. *Scott v. Trump Ind., Inc.*, 337 F.3d 939, 942 (7th Cir. 2003). The jurisdictional inquiry

focuses on Glaser's most recent amended complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.").

The False Claims Act prohibits the submission of false and fraudulent claims for payment to the government. 31 U.S.C. § 3729(a). It also authorizes private citizens (called "relators") to file civil actions on behalf of the government (called "qui tam" actions) to recover money that the government paid on account of false or fraudulent claims. *Id.* § 3730(b)(1). To encourage private citizens to come forward with knowledge of fraudulent activity, the FCA entitles prevailing relators to collect a substantial share of the funds they recover. *Id.* § 3730(d)(1)-(2). Qui tam actions are subject to a juris-dictional bar when the relator's action is

> based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [sic] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* § 3730(e)(4)(A). As we explained in *United States ex rel. Gear v. Emergency Medical Associates of Illinois, Inc.*, "[t]he bar is designed to deter parasitic *qui tam* actions," 436 F.3d 726, 728 (7th Cir. 2006), and "'once information becomes public, only the Attorney General and a relator

who is an "original source" of the information may represent the United States,' " *id.* (quoting *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 941 (7th Cir. 1996)).

Under § 3730(e)(4), the district court must conduct a three-step inquiry to determine whether it has jurisdiction to hear a qui tam suit under the False Claims Act. First, it examines whether the relator's allegations have been "publicly disclosed." If so, it next asks whether the lawsuit is "based upon" those publicly disclosed allegations. If it is, the court determines whether the relator is an "original source" of the information upon which his lawsuit is based. *See, e.g.*, *Caremark*, 496 F.3d at 736. At each stage of the jurisdictional analysis, the plaintiff bears the burden of proof. *See* 31 U.S.C. § 3731(c); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1472 (9th Cir. 1996); *cf. United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) ("The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction.").

### A.  Have Glaser's Allegations Been Publicly Disclosed?

For purposes of § 3730(e)(4), a "public disclosure" occurs when "the critical elements exposing the transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003). *Feingold* explained that a public disclosure "bring[s] to the attention of the relevant authority that there has been a false claim against the government." *Id.* The public-disclosure bar is designed to

prevent lawsuits by private citizens in such situations because "[w]here a public disclosure has occurred, that authority is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose." *Id.*

Glaser contends that the district court erroneously concluded that the CMS investigation into Wound Care's billing practices constituted a public disclosure, which is a question of law. She believes that unless the allegations of wrongdoing have been widely disseminated, the government must take some affirmative step to publicize its investigation. Nothing in § 3730(e)(4) requires such a showing. To the contrary, we have held that allegations have been publicly disclosed when they appeared in a warning letter from an agency, *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 606 (7th Cir. 2005); when they were the subject of a government audit, *Gear*, 436 F.3d at 728; when they were included in reports prepared by a government agency, *Feingold*, 324 F.3d at 496; or when information about fraudulent behavior has been provided to a "competent public official . . . who has managerial responsibility for the very claims being made," *Bank of Farmington*, 166 F.3d at 861.

Here, the allegations against Wound Care were publicly disclosed in an "administrative . . . audit or investigation," 31 U.S.C. § 3730(e)(4)(A), when CMS sent a letter to Dr. Miller in March 2005 demanding repayment for Wound Care's improper use of Dr. Miller's billing code. CMS also made clear to Wound Care beginning in January 2005 that it was actively investigating its billing practices. Although Glaser correctly notes that mere

governmental awareness of wrongdoing does not mean a public disclosure occurred, *see Bank of Farmington*, 166 F.3d at 860 n.5, "the purpose of a public disclosure is to alert the responsible authority that fraud may be afoot, and that purpose is served where that authority has itself issued [documents] containing information that substantiates an allegation of fraud," *Feingold*, 324 F.3d at 496. This is not a case where the government was simply aware of Wound Care's billing practices. Rather, the appropriate entity responsible for investigating claims of Medicare abuse had knowledge of possible improprieties with Wound Care's billing practices and was actively investigating those allegations and re-covering funds. *See Bank of Farmington*, 166 F.3d at 861 ("[D]isclosure to a public official with direct responsi-bility for the claim in question of allegations or trans-actions upon which a qui tam claim is based constitutes public disclosure within the meaning of § 3730(a)(4)."). CMS's communications with Wound Care indicate that it had commenced an investigation by March 2005 de-signed to recover money Wound Care should not have received. When Glaser filed her lawsuit challenging Wound Care's billing practices in April 2005, "the critical elements exposing the transaction as fraudulent [had been] placed in the public domain," *Feingold*, 324 F.3d at 495, and therefore the allegations at the heart of Glaser's lawsuit were publicly disclosed by the time her complaint was filed.[4]

---

[4] The Supreme Court recently granted certiorari to decide the related question of whether a public disclosure has occurred

(continued...)

## B.  Is the Lawsuit "Based Upon" Publicly Disclosed Information?

To trigger the public-disclosure bar of § 3730(e)(4), it is not enough that allegations of wrongdoing have been publicly disclosed; the relator's allegations must also be "based upon" the public disclosure. Glaser argues that her allegations are not "based upon" the CMS investigation of Wound Care because they neither depend "essentially upon publicly disclosed information" nor are they "actually derived from such information." *Caremark*, 496 F.3d at 737 (internal quotation marks omitted).

---

[4] (...continued)
under § 3730(e)(4) when allegations of wrongdoing appear in administrative reports or audits issued by state or local governments, as opposed to the federal government. *See United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292 (4th Cir. 2008) (holding that state and local administrative reports and audits are not public disclosures), *cert. granted*, No. 08-304, 2009 WL 1738653 (U.S. June 22, 2009). The Court's resolution of this question will not affect our analysis in this case because the disclosures at issue here appeared in the course of an investigation conducted by a federal agency. We note that before it granted certiorari in *Graham County Soil*, the Court sought the views of the Solicitor General; the Solicitor General recommended that the Court grant review. The Solicitor General's brief also noted the intercircuit conflict regarding the proper interpretation of the phrase "based upon" but observed that the Court need not resolve the circuit split in the process of deciding *Graham County Soil*. Brief for the United States as Amicus Curiae at 21 n.9, *Graham County Soil*, No. 08-304 (U.S. May 20, 2009).

Glaser's argument rests on the interpretation of the phrase "based upon" that we adopted in *Bank of Farmington* and reaffirmed in *Caremark*. Those cases held that a qui tam suit is based upon publicly disclosed information when it "depends essentially upon publicly disclosed information and is actually derived from such information." *Bank of Farmington*, 166 F.3d at 864. This interpretation rested on a plain-language understanding that "based upon" normally means "derived from." *Id.*; *accord United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347-48 (4th Cir. 1994) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 180 (1986)). *Bank of Farmington* reasoned that if the purpose of the jurisdictional bar is to block parasitic claims filed by opportunists trying to capitalize on publicly disclosed allegations of wrongdoing, it should not prohibit a suit by a relator who independently uncovers evidence of wrongdoing through his own investigation even though his allegations are the same or similar to allegations in the public domain. 166 F.3d at 863.

Although the Fourth Circuit has agreed with our approach, *see Siller* 21 F.3d at 1347-48, every other circuit to consider this question has adopted a different interpretation of § 3730(e)(4). Under the majority view, a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar. *United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh*, 186 F.3d 376, 388 (3d Cir. 1999); *accord United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1171-72 (10th Cir. 2007); *Minn. Ass'n of Nurse Anesthetists v. Allina*

*Health Sys. Corp.*, 276 F.3d 1032, 1047 (8th Cir. 2002); *United States ex rel. Biddle v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 161 F.3d 533, 537 (9th Cir. 1998); *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 684-85 (D.C. Cir. 1997); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995); *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir. 1992). These decisions generally concede that the approach adopted in *Bank of Farmington* is a faithful ordinary-meaning interpretation of the statute but nevertheless reject it because it renders the original-source exception to the § 3730(e)(4) bar superfluous. In addition, these circuits conclude that a broader interpretation is more consistent with the overall design of the jurisdictional bar, which balances the dual objectives of "encourag[ing] private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time," *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995), and deterring "self-serving opportunists, who do not possess their own insider information, [who will try] to get in on the action and try to collect on parasitic claims when the allegations have already been publicly disclosed and the insiders have nothing new to add," *Caremark*, 496 F.3d at 739. Information brought forward by relators in qui tam suits is less useful to the government once revelations about fraudulent conduct are in the public domain because the government is already aware that it might have been defrauded and can take responsive action. Thus, the

public-disclosure bar implements the congressional interest in "paying [relators] only for useful information." *Minn. Ass'n of Nurse Anesthetists*, 276 F.3d at 1047.

Because our approach in *Bank of Farmington* and *Caremark* is out of step with the approach taken by eight other circuits, Wound Care invites us to revisit it. "Although we must give considerable weight to our prior decisions, we are not bound by them absolutely and may overturn Circuit precedent for compelling reasons." *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005). We have overruled our prior decisions when our position remains a minority one among other circuits, *id.*; when the Supreme Court issues a decision on an analogous issue that compels us to reconsider our position, *Haas v. Abrahamson*, 910 F.2d 384, 393 (7th Cir. 1990); or when an intracircuit conflict exists, *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595-97 (7th Cir. 2001). Each of these justifications is present in this case.

We note for starters that only one other circuit (the Fourth) has adopted our interpretation. The Third Circuit has characterized the circuit split as "a clash between two textual arguments . . . : one based on the ordinary meaning of the phrase 'based upon' and one based on the precept that a statute should be construed if possible so as not to render any of its terms superfluous." *Mistick*, 186 F.3d at 387. The eight circuits that have rejected the ordinary-meaning interpretation have done so largely because, as the D.C. Circuit has aptly observed, it "swallows the original source exception whole." *Findley*, 105 F.3d at 683.

The original-source exception permits jurisdiction over an FCA action *even if* the relator's lawsuit is based upon publicly disclosed information *provided* that the relator is "an original source of the information." § 3730(e)(4)(A). The FCA defines an "original source" as someone "who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). If "based upon" means "actually derived from," as *Bank of Farmington* says, it is hard to understand the import of the "independent knowledge" component of the original-source exception; a relator who "actually derived" his allegations of fraud from (and therefore "based" his allegations "upon") information in the public domain could never avoid the jurisdictional bar by showing that he has "independent knowledge" of the fraud. Put another way, following our minority interpretation of "based upon," once a court concludes that a lawsuit is actually derived from publicly disclosed information, asking the original-source question never affects the jurisdictional result.[5]

---

[5] It is possible to imagine a handful of situations where the original-source exception might have independent meaning, such as if a lawsuit is "actually derived" only in part from public disclosures. *See Mistick*, 186 F.3d at 399-400 (Becker, C.J., dissenting). But every circuit to have considered the position of the *Mistick* dissent has rejected its approach, and we agree

(continued...)

Conversely, consider what happens when a court following the minority interpretation of "based upon" concludes that a lawsuit is *not* "actually derived" from publicly disclosed information. In those cases, the court has jurisdiction over the lawsuit *whether or not* the relator was an original source of the allegations in the qui tam complaint. Thus, under our minority interpretation of "based upon," the original-source exception is extraneous no matter how a court resolves the "actually derived from" question. If a court answers the question in the negative, the original-source exception is not implicated; if a court answers in the affirmative, the original-source inquiry is a waste of time.

Despite this difficulty, *Caremark* adhered to the *Bank of Farmington* interpretation—though acknowledging that the circuits in the majority had "powerful arguments" for rejecting it—because "the minority standard holds the trump card, the plain language interpretation." 496 F.3d at

_____

(...continued)

with their conclusion. *See, e.g., Minn. Ass'n of Nurse Anesthetists,* 276 F.3d at 1045 n.9 ("[Chief Judge Becker's interpretation] requires us to conclude that Congress used the 'based upon' language and the 'original source' language to refer to the same concept—whether a suit is derived from a public disclosure. Moreover, it would have been much more natural and straightforward for Congress to have said '*partly* based upon the public disclosure' and 'original source of *part* of the information' if the distinction between partial derivation and sole derivation had been central to how Congress meant the statute to work.").

738. We now conclude that this places too much impor-
tance on a dictionary interpretation of the phrase "based
upon" to the exclusion of other significant interpretive
considerations. Beyond the damage to the original-source
exception, other portions of § 3730(e)(4)(A) would yield
baffling results if we read them literally without regard to
context. For example, § 3730(e)(4)(A) refers to audits or
investigations by the "Government Accounting Office"
instead of the General Accounting Office, as well as
information obtained from criminal and civil "hearing[s]"
even though the statutory bar presumably covers informa-
tion publicly disclosed in trials, which are not commonly
referred to as "hearings." *See also Mistick*, 186 F.3d at 387-88
(describing other examples of poor drafting). As the
Third Circuit noted in *Mistick*, § 3730(e)(4) is hardly a
model of careful draftsmanship; the drafting errors
throughout § 3730(e)(4) should make us "hesitant to
attach too much significance to a fine parsing of the
syntax." *Id.* at 388. *Bank of Farmington* and *Caremark* parsed
§ 3730(e)(4) finely, but their focus on the dictionary mean-
ing of "based upon" alone was too narrow in the context
of the rest of the statute. *Pace v. DiGuglielmo*, 544 U.S. 408,
420 (2005) (statutory terms are given "their ordinary
meaning *in the context of the statutory scheme in which they
appear*" (emphasis added)).

Ultimately, the interpretation that carried the day in
*Bank of Farmington* and *Caremark* violates the principle
that "[a] statute should be construed so that effect is given
to all its provisions, so that no part will be inoperative or
superfluous, void or insignificant"—a principle the Su-
preme Court recently described as "one of the most basic

interpretive canons." *Corley v. United States*, 129 S. Ct. 1558, 1566 (2009). We might tolerate this result if the original-source inquiry added little or nothing to the jurisdictional analysis. But that is hardly the case. The original-source exception requires relators to establish that they have (1) "direct" knowledge of fraudulent activity; (2) "independent" knowledge of fraudulent activity; and (3) voluntarily provided their information to the government before filing a qui tam action. 31 U.S.C. § 3730(e)(4)(B). If a relator's allegations are actually derived from a public disclosure, the relator *might* be able to show that he has "independent" knowledge of the fraudulent activity and therefore bring himself within the second component of the original-source definition. But to avoid the jurisdictional bar at the original-source stage of the jurisdictional inquiry, the relator must *also* show he had "direct" knowledge of the fraud, a phrase usually interpreted to require the relator to establish that his knowledge of the wrongdoing was based on his own investigative efforts and *not* derived from the knowledge of others. *See United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003).

In addition, to be considered an original source, the relator must also have voluntarily disclosed the information to the government before filing a qui tam action, a requirement that is designed to reward those who come forward with useful information and not those who provide information in response to a governmental inquiry. *See, e.g., United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 338-41 (3d Cir. 2005). Yet as we have explained, under the *Bank of Farmington* and *Caremark* interpretation

of the phrase "based upon," a relator can avoid the jurisdictional bar by showing that his information did not "actually derive" from a public disclosure *without* a showing that he had direct knowledge of fraudulent conduct or that he voluntarily disclosed what he knew to the government.

To illustrate this, compare our decisions in *Caremark* and *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999), both of which concluded that the plaintiff-relator had avoided the jurisdictional bar. In *Lamers*, the relator alleged that a city agency lied about its efforts to transport local schoolchildren on public buses in order to obtain federal grant money; the relator had acquired this information by personally observing public bus routes to see if they complied with federal regulations. Although the Federal Transit Administration had issued an administrative decision several months prior to the qui tam filing finding that the City had violated federal regulations, the relator had conducted his investigation independently before the FTA decision was publicized and voluntarily gave the results of his investigation to the FTA. We concluded that the jurisdictional bar did not apply because the relator was an original source—he had direct and independent knowledge of fraudulent activity and had voluntarily given that information to the government.[6] *Id.* at 1017-18. By

---

[6] Our decision in *Lamers*, which was issued about a month after *Bank of Farmington* was decided, appears to have followed the

(continued...)

contrast, in *Caremark* we concluded that the jurisdictional bar did not apply because the relator's complaint was not "actually derived from" publicly disclosed information. 496 F.3d at 739. The relators in *Caremark* were thus able to avoid the jurisdictional bar without showing they had direct, independent knowledge of fraudulent activity or that they disclosed their knowledge to the government before filing their lawsuit.[7]

---

(...continued)

analysis called for under the majority approach. Since the § 3730(e)(4) inquiry is a sequential one, our consideration of whether the relator was an "original source" necessarily presupposed that the relator's claim was based on a public disclosure. It is true that *Lamers* did not address how the threshold "based upon" inquiry should be approached. But if *Lamers* had applied the approach we announced in *Bank of Farmington*, our conclusion should have rested on a different ground—namely, that the relator's action was not based upon a public disclosure because the relator did not "actually derive" his allegations from the public disclosure. *E.g., United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 (11th Cir. 1994) ("A court reaches the original source question only if it finds the plaintiff's suit is based on information public[ly] disclosed."). *Caremark* did not cite *Lamers*.

[7] We note that the relators in *Caremark* would likely have been able to avoid the jurisdictional bar even under the interpretation of "based upon" that we adopt today because they would have been able to show they were original sources of the information in their complaint. The relators were employed by Caremark at two of its prescription-drug facilities, and they

(continued...)

*Caremark* justified its continued adherence to the minor-ity approach of *Bank of Farmington* because it struck a balance between two competing policy concerns: the fear that opportunistic plaintiffs would try to "get in on the action" when they "have nothing new to add" and the desire to encourage those with knowledge about fraudu-lent conduct to come forward. *Id.* These are, as we have noted, the manifest objectives of § 3730(e)(4), but *Caremark* went astray in thinking that the threshold "based upon" language in the statute addresses these competing policies *by itself*. Instead, § 3730(e)(4) must be considered *in its entirety*.

The threshold jurisdictional bar against lawsuits that are "based upon" publicly disclosed allegations addresses the first policy concern: prohibiting FCA lawsuits filed by

---

(...continued)

claimed that Caremark engaged in a variety of fraudulent schemes. The allegations against Caremark had been publicly disclosed when Caremark gave the U.S. Attorney's office thousands of documents during the government's investigation of Caremark's business practices. *Caremark*, 496 F.3d at 736-37. Yet our analysis also suggested that the relators, who first alerted the government to possible improprieties in Caremark's business practices and therefore "voluntarily provided" it to the government, had "direct and independent" knowledge of Caremark's business practices; the complaint was based on the relators' personal knowledge (and so the relators had "direct" knowledge) and did not rely on any information obtained from the U.S. Attorney's office (and so their knowledge was "independent"). *Id.* at 738-39.

opportunistic plaintiffs concerning information about fraud that is already in the public domain. By carving out an exception for original sources, the statute preserves the objective of "inspiring whistleblowers to come forward promptly with information concerning fraud so that the government can stop it and recover ill-gotten gains." *Findley*, 105 F.3d at 685. The qui tam provisions of the FCA are designed to "encourage persons with '*first-hand* knowledge of fraudulent misconduct,' or those 'who are either *close observers* or *otherwise involved* in the fraudulent activity' to come forward." *Barth*, 44 F.3d at 703 (citation omitted). *Bank of Farmington*'s interpretation subverts this goal by allowing relators to avoid the public-disclosure bar without demonstrating that they have direct knowledge of fraudulent activity or that they are not under any governmental compulsion to reveal their knowledge of fraudulent conduct.

We also note that while the minority interpretation tends to resolve the jurisdictional inquiry at the "based upon" stage, the Supreme Court recently implied in *Rockwell International Corp. v. United States*, 549 U.S. 457, that the main jurisdictional focus is on the "original source" requirement. In *Rockwell*, the Court was asked to interpret the original-source requirement of § 3730(e)(4)(B). One of the questions before the Court was whether the phrase "information on which the allegations are based" in § 3730(e)(4)(B) refers to information on which the *relator's allegations* are based or information on which the *publicly disclosed allegations* that triggered the public-disclosure bar of § 3730(e)(4)(A) are based. The Court adopted the former interpretation and in doing so imag-

ined a hypothetical relator who "has direct and independent knowledge of different information supporting the same allegation." The Court concluded that such a relator would be considered an original source. 549 U.S. at 471-72. Although *Rockwell* did not address the meaning of the phrase "based upon" in § 3730(e)(4)(A), we think it significant that under our minority interpretation of the phrase, the hypothetical posited by the Court would be resolved at an earlier step of the jurisdictional inquiry without ever reaching the question of whether the relator was an original source. Yet given the sequential nature of the jurisdictional inquiry required by the statute, the Supreme Court's discussion assumes that its hypothetical relator *is* subject to the public-disclosure bar, for otherwise there would be no need to address the original-source exception at all. *Id.* at 467 ("As this case comes to the Court, it is conceded that the claims on which Stone prevailed were based upon publicly disclosed allegations within the meaning of § 3730(e)(4)(A)."); *see also Barth*, 44 F.3d at 703 ("A court reaches the original source question only if it finds the plaintiff's suit is based on information that has already been publicly disclosed."). This is another reason to rethink our interpretation of the "based upon" language in § 3730(e)(4)(A).

The facts of this case aptly illustrate the flaws in the *Bank of Farmington*/*Caremark* approach. Glaser testified that she learned of Wound Care's improper billing from her attorney, and her attorney said she first became aware of possible fraudulent billing practices in August 2003. That means that more than 20 months elapsed from the time that Glaser's attorney said she

first learned of Wound Care's conduct and the time she filed this qui tam action on Glaser's behalf. In the meantime, CMS commenced an investigation of Wound Care's billing irregularities and eventually—some four months *before* Glaser's lawsuit was filed—notified Wound Care of its findings. The relator provisions of the FCA are designed "to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time." *Barth*, 44 F.3d at 704. The circumstances here illuminate the inconsistencies between the *Bank of Farmington/Caremark* approach and the statutory design.

Accordingly, we are now convinced that *Bank of Farmington* and *Caremark* gave undue weight to the "dictionary" interpretation of § 3730(e)(4) without considering the phrase "based upon" in the context of the rest of the public-disclosure bar—particularly the original-source exception. Our interpretation of "based upon" as meaning "actually derived from" renders the original-source exception superfluous and ignores the exception's role in balancing the FCA's competing policy goals. The majority interpretation, as the Tenth Circuit put it, treats the question of whether a lawsuit is "based upon" a public disclosure as a "threshold analysis . . . intended to be a quick trigger for the more exacting original source analysis." *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir. 2004) (internal quotation marks omitted). We now adopt the majority position and conclude that a relator's FCA complaint is "based upon" publicly disclosed allegations or transactions when the allegations in the relator's complaint are substantially

similar to publicly disclosed allegations. To the extent *Bank of Farmington* and *Caremark* interpreted the statutory phrase "based upon" differently, those cases are overruled.

Applying this standard to Glaser's complaint, we conclude that her allegations are based upon the allegations that were the subject of CMS's prior investigation. As the March 2005 letter from CMS to Dr. Miller makes clear, the CMS investigation focused on whether Wound Care had properly billed the government for services performed by its physician's assistants. Like the CMS investigation, Glaser's complaint alleges that Wound Care overbilled the government for physician's assistants' services by falsely representing that they had been performed "incident to" a physician's services. These allegations of wrongdoing are virtually identical—they pertain to the same entity and describe the same fraudulent conduct—which is enough for us to conclude that Glaser's allegations are substantially similar to the allegations that were at the heart of the CMS investigation.

Glaser argues that her complaint is not based on the CMS investigation because her complaint contains particular allegations of fraud that are not mentioned in CMS's January or March 2005 communications with Wound Care nor discovered during its investigation into Wound Care's billing practices. It is true that Glaser's complaint adds a few allegations not covered by CMS's investigation. But this is not enough to take this case outside the jurisdictional bar, properly understood; "based upon" does not mean "solely based upon." *Accord*

*McKenzie*, 123 F.3d at 940; *Fed. Recovery Servs.*, 72 F.3d at 451. "[A]n FCA *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions. Congress chose not to insert the adverb 'solely', and we cannot, because to do so would dramatically alter the statute's plain meaning*." United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992). We therefore conclude that because the allegations in Glaser's complaint (or most of them) were substantially similar to publicly disclosed allegations, Glaser's complaint is based upon those public disclosures and therefore falls within the threshold jurisdictional bar of § 3730(e)(4)(A). *E.g., United States ex rel. Battle v. Bd. of Regents for the State of Ga.*, 468 F.3d 755, 762 (11th Cir. 2006).

## C. Was Glaser an Original Source of the Allegations in Her Complaint?

Glaser may avoid the public-disclosure bar if she can show that she was an "original source" of the information upon which the allegations in her complaint were based. *See Rockwell*, 549 U.S. at 470-72. She is an "original source" if she (1) has "direct" knowledge of the information on which her allegations are based; (2) has "independent" knowledge of the information on which her allegations are based; and (3) "has voluntarily provided the information to the Government before filing" a complaint based on her information. 31 U.S.C. § 3730(e)(4)(B).

We question whether Glaser can show she has direct knowledge of the information supporting her allega-

tions. We have never precisely defined the term "direct," and we need not do so today.[8] But we note that the only knowledge Glaser has of Wound Care's billing practices comes from her attorney. At oral argument Glaser made much of the fact that she had direct knowledge that she had been treated by a physician's assistant and not a doctor. But the fraud alleged pertains to the billing, not the treatment. Glaser's only knowledge that Wound Care's billing practices were improper came from Lapointe, with whom Glaser had no prior relationship and who contacted her out of the blue. It would be one thing to say that an FCA relator has direct knowledge of the information supporting her allegations because she is personally aware of at least one instance of fraudulent conduct and her attorney's subsequent investigation

---

[8] We note that other courts have used a variety of formulations to describe what Congress meant when it used the term "direct." Other circuits have interpreted "direct" to mean "marked by absence of an intervening agency, instrumentality, or influence: immediate," *Stinson*, 944 F.2d at 1160 (internal quotation marks omitted); "first-hand," *Findley*, 105 F.3d at 690; "saw with [the relator's] own eyes," *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir. 1992); "unmediated by anything but [the relator's] own labor," *id.*; and "[b]y the relator's own efforts, and not by the labors of others, and . . . not derivative of the information of others," *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999). Given our conclusion that Glaser lacks independent knowledge of the information on which her allegations are based, we need not settle on one of these descriptions today.

uncovers other fraudulent behavior. *See Paranich*, 396 F.3d at 336. It would be quite another to say that an FCA relator has direct knowledge for purposes of the original-source exception even though she had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney.

Ultimately, it does not matter whether Glaser could have been deemed to have "direct" knowledge under the statute because she has not met her burden of proving she has "independent" knowledge. To establish this element, we have required that the relator be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Bank of Farmington*, 166 F.3d at 865. Glaser thinks she can establish this simply by providing (1) her own testimony that she had no knowledge of the CMS investigation and that her only knowledge of Wound Care's billing practices came from her attorney and (2) an affidavit from her attorney who swears she first learned of the problems with Wound Care's billing practices by 2003 and had no knowledge of the CMS investigation.

The problem is that Glaser has asserted the attorney-client privilege to prevent us from learning how her attorney first learned of Wound Care's billing practices. If a relator says all her knowledge of fraudulent activity comes from a third party (even if the third party is her attorney) but refuses to explain how that third party learned of the fraud, she cannot meet her burden of proving she has independent knowledge just by claiming she had no knowledge of public disclosure. Because

Glaser has the burden of proving the jurisdictional facts, she has not established her independent knowledge of improprieties in Wound Care's billing practices and therefore she cannot be an original source of the allegations in her complaint.[9] *See United States ex rel. Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 505 (7th Cir. 1989).

### III. Conclusion

The district court correctly concluded that the jurisdictional bar of § 3730(e)(4)(A) applies to Glaser's qui tam suit. The allegations in Glaser's complaint about Wound Care's billing practices are based upon publicly disclosed information, and Glaser has not shown she is an original source of the information used to support the allegations. We therefore AFFIRM the judgment of the district court dismissing the case for lack of subject-matter jurisdiction.

---

[9] It is not necessary to decide in this case whether information obtained by a relator's agent may be imputed to the relator for the purpose of § 3730(e)(4).