In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1780

UNITED STATES OF AMERICA
*ex rel.* LUANN ZIEBELL,

*Plaintiff-Appellant,*

*v.*

FOX VALLEY WORKFORCE
DEVELOPMENT BOARD, INC., and
WORKFORCE ECONOMICS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10 C 436 — **William C. Griesbach**, *Chief Judge.*

ARGUED FEBRUARY 9, 2015 — DECIDED NOVEMBER 25, 2015

Before ROVNER and SYKES, *Circuit Judges*, and ANDREA R.
WOOD, *District Judge.*[*]

[*] Of the Northern District of Illinois, sitting by designation.

SYKES, *Circuit Judge*. In 2003 LuAnn Ziebell began work-ing at the Fox Valley Workforce Development Board, Inc., a state job-training agency serving central Wisconsin with funding from the federal government. She was fired in 2008. Almost two years later, she filed a qui tam action alleging that the Board violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by improperly contracting services through a subsidiary corporation. As best we can tell, her claim relies on a theory known as "false certification"; she alleges that the Board made false certifications of regulatory compliance as a predicate to receiving federal funds. She also alleges that she was fired in retaliation for engaging in activity protected by the Act. The district court found both claims factually deficient and entered summary judgment for the Board.

Ziebell's qui tam claim faces a jurisdictional hurdle. To prevent parasitic lawsuits, the False Claims Act blocks jurisdiction over qui tam claims that are based on infor-mation already in the public domain. Here, the alleged improprieties by the Board were revealed in a routine audit performed by its supervising state agency, which counts as a "public disclosure" under the Act. An exception applies if Ziebell can show that she was the "original source" of the information. She has not done so. Accordingly, we dismiss Ziebell's qui tam claim for lack of jurisdiction. On the retalia-tion claim, we affirm the judgment for the Board. There's no evidence that Ziebell was fired in retaliation for engaging in protected activity.

## I. Background

The Fox Valley Workforce Development Board was formed in 2000 under the auspices of the Workforce Invest-ment Act of 1998, *see* 29 U.S.C. §§ 2801 *et seq.*, a federal job-

training program that provides funding to state-level in-vestment boards, which in turn channel funds to area-designated workforce "development boards." The develop-ment boards are multi-stakeholder bodies whose representa-tives are appointed by local elected officials.

During the time period relevant here, the Fox Valley Board provided job-training services in the Wisconsin counties of Calumet, Fond du Lac, Green Lake, Outagamie, Waupaca, Waushara, and Winnebago. Ziebell was hired as an executive assistant in 2003 and the following year was promoted to finance director. During Ziebell's entire tenure with the Board, she reported to its executive director, Cheryl Welch.

Development boards provide services through subcon-tractors selected via a competitive bidding process. The Fox Valley Board contracted out a particular basket of services—called Adult and Dislocated Worker Services—to a firm known as Career Pros. That company dissolved in the summer of 2004. The Board responded to this event by creating its own subsidiary, Workforce Economics, Inc., which subsumed the former Career Pros staff. This had the desirable effect of maintaining continuity of service, but it took the agency out of regulatory compliance. Under federal rules implementing the Workforce Investment Act, devel-opment boards are not supposed to directly provide ser-vices.

In September 2007 the Wisconsin Department of Work-force Development ("DWD"), the state agency responsible for overseeing the area development boards, conducted a routine audit of the Board's activities. The audit report criticized the Board for providing services through its own

subsidiary and recommended an end to the practice. In a letter dated February 1, 2008, Welch acknowledged the problem and advised DWD that the Board would return to competitive bidding for Adult and Dislocated Worker Services. The letter also stated that Workforce Economics would not bid on services for the remainder of 2008 or for 2009.

The Board thereafter solicited bids but received only two. Of those two, one covered only four of the counties in the Board's service area, while the other bidder was deemed too inexperienced to competently provide the required services. As a result, by the time the full Board met on May 15, 2008, Welch had decided to continue providing services through Workforce Economics.

Ziebell attended the May 15 meeting with copies of the DWD audit report and Welch's responsive letter in hand. She did not ask to speak but instead "tried to create a disturbance" by speaking to other board members while the meeting was in progress. She hoped that by disrupting the meeting she would prompt someone to inquire about the documents she brought with her, at which point she would expose Welch's plot to stick with Workforce Economics, the Board's in-house service provider. Things didn't unfold that way. Rather, Welch explained the problem with the bids and suggested that the Board allow Workforce Economics to bid to provide the necessary services. The board members and local elected officials agreed. Ziebell had no influence on the decision.

Four days later Welch and the Board's Chief Operating Officer called Ziebell to a meeting and fired her. Welch read from a script listing the reasons for the termination decision. These included (among other reasons): (1) Ziebell had

admitted to skipping work to play golf; (2) she had disrupted the May 15 board meeting; (3) she chose not to further her formal education; and (4) she submitted mileage-reimbursement forms that contained some irregularities. After reading the script, Welch asked Ziebell if she preferred to resign. Ziebell rejected that suggestion, saying, "[t]here is no way in Hell I am going to resign. If you want to terminate me, you will have to pay the consequences."

In July Ziebell filed a complaint with DWD alleging unlawful retaliation for engaging in activity protected by the False Claims Act. Almost two years later she brought this qui tam action on behalf of herself and the United States alleging that the Board violated the Act. She also alleged that the Board fired her in retaliation for activity protected under the Act. The United States declined to participate in the qui tam claim. While the suit was pending, the U.S. Department of Labor conducted its own review of Wisconsin's workforce development programs and found various compliance deficiencies by a number of area workforce development boards. There were no findings of fraud. The Labor Department reported its findings to the DWD, which has since been working with federal authorities to alleviate the remaining concerns.

The district court granted summary judgment for the Board, concluding that Ziebell's claims lacked factual support. This appeal followed.

## II. Analysis

The False Claims Act prohibits the submission of a false or fraudulent claim for payment to the government. 31 U.S.C. § 3729(a). Under the Act, private citizens may file

civil actions on behalf of the United States to recover money the government paid because of a false or fraudulent claim. *Id.* § 3730(b)(1). The Act incentivizes these qui tam suits by allowing prevailing "relators" (the citizen plaintiffs) to recover a share of the enhanced recovery allowed under the statute. *Id*. § 3729(a) (providing for treble damages and other penalties); *id.* § 3730(d)(1)–(2) (providing for an award to prevailing qui tam plaintiffs).

Ziebell focuses on the Board's regulatory noncompliance—its use of an in-house service provider—but she hasn't clearly articulated a false-claims theory of her case. She appears to be trying to invoke a theory known as "false certification," which derives from § 3729(a)(1)(B). That section imposes liability against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* To prevail on a claim of false certification, the relator must prove that: (1) the defendant certified its compliance with particular statutory or regulatory requirements that were "conditions of, or prerequisites to, government payment"; (2) the defendant "did not actually comply with those conditions; and (3) the defendant "knew it had failed to comply with those conditions." *United States ex rel. Absher v. Momence Nursing Center, Inc.*, 764 F.3d 699, 710–11 (7th Cir. 2014) (citing *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005)).

Ziebell identifies three documents that she claims were false or misleading certifications—a 2000 "Consortium Agreement," a "Local Plan" for the years 2005–2007, and Welch's February 1, 2008 response to the DWD audit.

We note for starters that the Consortium Agreement pre-dates the formation of the Board; it also contains only a generic promise to "conform to all the fiscal requirements of all applicable laws." The Local Plan, too, contains only a boilerplate general promise of future regulatory compliance. Welch's letter is only somewhat more specific. In it she states that Workforce Economics—the Board's in-house service provider—would not be bidding to provide services for the rest of 2008 or for 2009. She also states more generally that the Board would be "reviewing procedures" to "ensure [Workforce Investment Act] rules are followed."

Promises of future compliance can be false or fraudulent only if made with intent not to perform. As we've explained before in this context, "fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something *it plans not to do*." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) (emphasis added). Ziebell has ad-duced no evidence suggesting that any of these statements was made with fraudulent intent. Ziebell's false-certification theory runs into further trouble in that none of these docu-ments has any apparent nexus to federal payments.

But aside from these factual infirmities, there's an ante-cedent question of our jurisdiction over Ziebell's claim. The False Claims Act generally bars qui tam actions that are based on information already in the public domain. At the time period in question here, the so-called "public disclo-sure" bar stated as follows (it has since been amended):

> No court shall have jurisdiction over an action under this section based upon the public dis-closure of allegations or transactions in a crim-

inal, civil, or administrative hearing, in a con-
gressional, administrative, or Government
Accounting Office report, hearing, audit, or in-
vestigation, or from the news media, unless the
action is brought by the Attorney General or
the person bringing the action is an original
source of the information.

31 U.S.C. § 3730(e)(4)(A).

This language clearly withdraws jurisdiction over qui
tam actions that are based on publicly disclosed information
*unless* the relator is an "original source" of the information.
*See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468
(2007); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907,
912 (7th Cir. 2009). The point of the jurisdictional bar is to
"deter parasitic *qui tam* actions." *United States ex rel. Gear v.
Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 728 (7th Cir.
2006). Once information is public, "only the Attorney Gen-
eral and a relator who is an 'original source' of the infor-
mation may represent the United States." *Id.* (quoting *United
States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 941 (7th
Cir. 1996)).

Our cases establish a three-step inquiry to determine
whether a qui tam claim falls within the public-disclosure
bar. We ask (1) have the relator's allegations been publicly
disclosed; (2) if so, is the lawsuit "based upon" those public-
ly disclosed allegations; and (3) if it is, was the relator the
original source of the information? *Glaser*, 570 F.3d at 913.
The relator bears the burden of establishing jurisdiction.
*Absher*, 764 F.3d at 707; *Glaser*, 570 F.3d at 913 ("At each stage
of the jurisdictional analysis, the plaintiff bears the burden of
proof.").

Information is publicly disclosed if "the critical elements exposing the transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003). Disclosure by units of state and local governments count as public disclosures. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 301 (2010) ("Today's ruling … confirms that disclosures made in one type of context—a state or local report, audit, or investigation—may trigger the public disclosure bar."). "[A] relator's [qui tam] complaint is 'based upon' publicly disclosed allegations or transactions when the allegations in the relator's complaint are *substantially similar* to publicly disclosed allegations." *Glaser*, 570 F.3d at 920 (emphasis added).

Ziebell's claim rests on the Board's improper practice of provided services directly through Workforce Economics. That's precisely what DWD found in its audit, so her qui tam claim is plainly "based on" the DWD's public disclosure of this information. Ziebell doesn't argue otherwise. Instead, she tries to bring herself within the original-source exception. "The original-source exception requires relators to establish that they have (1) 'direct' knowledge of fraudulent activity; (2) 'independent' knowledge of fraudulent activity; and (3) voluntarily provided their information to the government before filing a qui tam action." *Id.* at 917 (quoting 31 U.S.C. § 3730(e)(4)(B)).

Ziebell hasn't come close to satisfying these requirements. Although it may be reasonable to infer that she had direct knowledge of the Board's relationship with Workforce Economics as a general matter, she hasn't shown that she had direct *and independent* knowledge—apart from the DWD

audit report—that this relationship created a problem of regulatory compliance. More to the point, she hasn't shown that she had direct and independent knowledge of any fraudulent-claims activity by the Board. Finally, it's clear that Ziebell did not voluntarily provide *any* information about her allegations to the federal government before filing suit. Indeed, she admitted in her deposition that it was *the DWD report* that "started some of the ball rolling" regarding the regulatory dilemma created by the use of an in-house service provider and that she talked to "no one" in the federal government about this until after she filed suit. Ziebell's qui tam claim clearly falls within the public-disclosure bar and must be dismissed for lack of jurisdiction.

Ziebell's retaliation claim fails on the merits. The False Claims Act provides a cause of action to any employee who is "discharged, demoted, suspended, threatened, harassed, or [otherwise] discriminated against … because of lawful acts" undertaken "in furtherance of" a qui tam action. 31 U.S.C. § 3730(h)(1). To prevail on a retaliation claim requires proof that "(a) [the plaintiff's] actions were taken 'in furtherance' of [a False Claims Act] enforcement action and were therefore protected by the statute; (b) his employer had knowledge that he was engaged in this protected conduct; and (c) his discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

Ziebell has satisfied none of these elements. First, as we've already noted, the record doesn't show any fraudulent-claims activity; at most it shows regulatory noncompliance. As *Fanslow* explains, "there is an objective component to the test for a [retaliation] claim under § 3730(h), as well as

a subjective one." *Id.* at 479–80. In other works, it's not enough for Ziebell to *think* she's enforcing the False Claims Act; a reasonable employee in the same position must be able to think the same thing. *Id.* at 480 ("We agree with several of our sister circuits, which have held that the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002))). Because Ziebell's qui tam claim lacks factual support, no reasonable employee in similar circumstances would believe that the Board was committing fraud against the federal government.

Moreover, there's no evidence that Ziebell took any action toward a qui tam claim before she was fired. Nor is there anything in the record to suggest that the Board had any idea that she was even *contemplating* a qui tam claim. Finally, Ziebell was fired for a variety of reasons ranging from truancy to causing a disruption at the May 2008 board meeting. Nothing suggests that the decision was motivated in part by protected activity. Ziebell offers no evidence that the reasons given for her firing were pretexual. Nor could she; Ziebell gave her superiors no indication she was taking steps toward a False Claims Act enforcement action. Although her disruption of the May 2008 board meeting was related to the improper subcontract with Workforce Economics, disrupting a meeting hardly qualifies as protected activity absent something more. The retaliation claim is woefully lacking in factual support.

Accordingly, for the foregoing reasons, we DISMISS the qui tam claim for lack of jurisdiction. In other respects the judgment is AFFIRMED.