PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GAGIK URUTYAN,

*Defendant-Appellant.*

No. 08-4295

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, Chief District Judge.
(3:07-cr-00041-JRS-1)

Argued: March 24, 2009

Decided: May 7, 2009

Before DUNCAN and AGEE, Circuit Judges, and David A.
FABER, Senior United States District Judge for the
Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Agee and Senior Judge Faber joined.

## COUNSEL

**ARGUED:** James Fred Sumpter, Midlothian, Virginia, for Appellant. Laura Colombell Marshall, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for

Appellee. **ON BRIEF:** Chuck Rosenberg, United States Attorney, Alexandria, Virginia, Richard D. Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

Gagik Urutyan ("Urutyan") challenges his conviction for bank fraud, conspiracy to commit bank fraud, and aggravated identity theft.[1] Urutyan's sole claim on appeal is that the district court deprived him of his Sixth Amendment right to counsel by disqualifying one of his attorneys. Because the district court did not abuse its discretion in concluding that continued representation by the attorney in question posed a serious potential for conflict of interest, we affirm.

I.

Urutyan was convicted of participation in a bank fraud scheme that involved the theft of personal identity information. The evidence adduced at trial reflects the following sequence of events. In August 2006, Urutyan took a job at a gas station in Mechanicsville, Virginia, in order to gain access to the gas station's Verifone Pin Pad 2000, the device on which customers swipe their debit cards and enter their pin numbers. Urutyan was able to compromise the device and use it to steal the debit card and pin numbers of hundreds of customers. On December 12, 2006, Urutyan quit his job at the gas station and, along with at least five coconspirators, uti-

---

[1]Although Urutyan's notice of appeal was not timely filed under Federal Rule of Appellate Procedure 4(b), the government has waived any objections on this ground. As discussed below, we conclude that Urutyan's failure to comply with Rule 4(b) does not deprive this court of subject-matter jurisdiction.

lized the stolen data to conduct fraudulent withdrawals from ATMs in Virginia, Maryland, Delaware, Pennsylvania, and New Jersey. Over a sixteen-day period, Urutyan and his coconspirators stole more than $600,000 from the accounts of more than 500 victims, all of whom had used their debit cards at the Mechanicsville gas station. The stolen money was wired to recipients in Russia and Armenia.

Urutyan was arrested on January 12, 2007, and a federal public defender was appointed to represent him. On February 6, 2007, Urutyan replaced his appointed counsel with attorney Elliot Bender. On March 7, 2007, William Graysen, a California attorney, was admitted pro hac vice to represent Urutyan.

On June 5, 2007, a federal grand jury returned a second superseding indictment naming Urutyan and five coconspirators. Urutyan was charged with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 1349, two counts of bank fraud in violation of 18 U.S.C. § 1344, and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A.

On August 2, 2007, the government sent a letter to Graysen asking for information about his fee arrangement with Urutyan and the source of funds for Urutyan's representation. Graysen responded that he was retained on or about February 1, 2007, with a fee of $25,000. JA at 1022. Graysen said the fee was paid in cash by a man named David who declined to give his last name, phone number, or address. *Id.* Graysen said that there was no written fee agreement and that, rather than deposit the cash in any bank account, he kept it for "personal use." *Id.* Graysen said that he intended to include the income on his tax return and to report receipt of the cash with the Internal Revenue Service on or before January 31, 2008 (approximately one year after receipt). *Id.*[2]

---

[2]IRS Form 8300, which is used to report cash payments over $10,000 received in a trade or business, generally must be filed within fifteen days of the date the cash was received. *See* 26 U.S.C. § 6050I; IRS Form 8300.

On August 24, 2007, the government filed a Motion for Conflict of Interest Inquiry to determine whether Graysen was being paid by a third party to represent Urutyan. In support of its motion, the government provided transcripts of several telephone conversations between Urutyan and a female coconspirator who had not yet been arrested at the time of the call, but who later became a codefendant. The calls had been recorded January 22, 2007, and were translated from Russian. During one call, the codefendant told Urutyan, "Well, they said to write you and let you know that you have a lawyer. . . . Someone from California." JA at 965. In another call, Urutyan asked, "So what, is it an expensive lawyer? . . . More than forty?" JA at 980. The codefendant replied, "Yes. It will be even more than that." *Id.* And, in yet another call, the codefendant said she "gave it all to them . . . [a]nd that they will sort of pay for the lawyer . . . they will give it back to you and the remains will be paid to the lawyer." JA at 978.

The district court held a hearing on September 17, 2007, to determine whether Graysen could continue as counsel for Urutyan. In addition to the foregoing facts, the district court heard evidence that, although Graysen had previously stated his intention to file a Form 8300 with the IRS, he failed timely to do so. It also emerged that David paid Graysen an additional $60,000 in cash to secure representation for three of Urutyan's codefendants. Graysen said he used the money to hire separate counsel for the codefendants at a cost of $18,000 each and kept a $6,000 referral fee for himself.

Graysen offered several explanations for the somewhat unusual nature of the arrangements. Graysen said that David, like Urutyan, was Armenian and had raised the money from family and friends. Graysen suggested that it was not uncommon for members of the Armenian community to use only their first names when "dealing with the law, civil or criminal." JA at 997. Regarding his failure to deposit the initial $25,000 in a bank account,[3] Graysen argued that he was not

---

[3]As the district court observed, Rule 4-100(A) of the California Rules of Professional Conduct requires that "[a]ll funds received or held for the

required to deposit the cash in a bank account because, under California's so-called "true retainer" rule,[4] the cash constituted a fee earned upon receipt. JA at 1044. Regarding his failure timely to file a Form 8300 with the IRS, Graysen said he was mistaken about the applicable deadline. And when asked by the district court why there had been no written retainer agreement with David, Graysen replied, "I have an explanation for that, too. Where two Armenians trust each other, or two people, one being Armenian and one being American, trust each other, there is no need for a retainer. It is something of an insult. They believe a man's word is his bond." JA at 1043.

During the hearing, the government informed the district court that Graysen was a "subject" of its ongoing criminal investigation. Although Graysen had not been indicted, the government argued that Graysen's status as a "subject" of investigation created a potential conflict of interest separate from any conflict arising from Graysen's being paid by a third party.

Based on this evidence, the district court disqualified Graysen as counsel on the ground that his continued representation of Urutyan would pose "a serious potential conflict based on two grounds[:] (1) the great likelihood that Mr. Graysen was paid by a third party who is a member of the

---

benefit of clients by a member of a law firm, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts."

[4]*See generally Baranowski v. State Bar*, 593 P.2d 613, 618 n.4 (Cal. 1979) ("A retainer is a sum of money paid by a client to secure an attorney's availability over a given period of time. Thus, such a fee is earned by the attorney when paid since the attorney is entitled to the money regardless of whether he actually performs any services for the client."); *but see In re Brockway*, No. 01-O-03470, 2006 WL 1360438, at *4-5 (Cal. Bar Ct. May 15, 2006) (holding that advance payment for future legal services, as opposed to mere future availability, is not a true retainer).

alleged criminal enterprise and (2) the Government's charac-
terization of Mr. Graysen as a subject in their investigation."
JA at 1070.

With respect to the third-party payment arrangement, the
district court explained that the recorded telephone conversa-
tions "strongly indicate that Mr. Graysen was paid with pro-
ceeds illegally gained by a member of the alleged fraud
conspiracy." JA at 1071. Further, the district court found that
the "facts that Mr. Graysen did not deposit the $25,000 . . .
nor file the appropriate IRS forms and that 'David' refuses to
give his last name all support the inference that David is a
member of the alleged fraud scheme and that the cash
received by Mr. Graysen is the fruit of the alleged illegal
activity." JA at 1071. The district court reasoned that "not
only is it possible that Mr. Graysen is acting as an agent of
a third party who has interests which are potentially in con-
flict with those of his client, but this fee arrangement may also
discourage Urutyan from considering a plea because more
than likely a co-conspirator has paid his legal fees." JA at
1072. Further, the district court noted the possibility that "the
Government may choose to establish the fraud conspiracy by
showing the payment of $85,000 in cash to Mr. Graysen,
which would result in Mr. Graysen becoming a potential wit-
ness against his client." *Id.*

With respect to Graysen's having been characterized as a
"subject" of the government's ongoing investigation, the dis-
trict court noted the potential conflict of interest posed by an
attorney who is distracted from providing effective represen-
tation by "his concern to avoid his own incrimination." JA at
1072-73 (citation omitted). The district court then evaluated
the evidence, reasoning that "Mr. Graysen's extensive interac-
tion with David, the strong likelihood that the $25,000 Mr.
Graysen received was proceeds from the alleged fraudulent
scheme, and Mr. Graysen's complete failure to deposit the
funds and file the appropriate IRS forms are sufficient to sup-

port the Government's identification of Mr. Graysen as a subject in their investigation." JA at 1075.

Graysen was thus disqualified, and Urutyan went to trial, still represented by Elliot Bender.[5] Urutyan was convicted by a jury on all counts. Judgment was entered against him on January 22, 2008. Urutyan filed a notice of appeal with the district court March 4, 2008. The notice was not timely. Appellate Rule 4(b)(1)(A) imposes a ten-day deadline on the filing of a notice of appeal in criminal cases, and Urutyan never requested an extension of that deadline. Prior to oral argument, the government expressly waived any objection based on the timeliness of Urutyan's notice of appeal.

Urutyan's sole argument on appeal is that his Sixth Amendment right to counsel was violated when the district court disqualified attorney William Graysen from representing him.

## II.

We first consider whether we have subject-matter jurisdiction with respect to this appeal. Urutyan's notice of appeal was untimely under Federal Rule of Appellate Procedure 4(b)(1)(A), which requires that "[i]n a criminal case, a defendant's notice of appeal must be filed in the district court within ten days after . . . the entry of either the judgment or the order being appealed." Fed. R. App. P. 4(b)(1)(A).

Urutyan's judgment of conviction was entered on January 22, 2008, and his notice of appeal was not received by the district court until March 4, 2008, more than ten days later.[6] The

---

[5]Although Graysen paid Bender's fees, the district court did not disqualify Bender as counsel for Urutyan.

[6]Although Appellate Rule 4(b)(4) authorizes a district court to extend the deadline up to thirty additional days "[u]pon a finding of excusable neglect or good cause," Fed. R. App. P. 4(b)(4), Urutyan never sought such an extension and the district court never granted one.

government has expressly waived any objection on timeliness grounds. Nevertheless, we are obliged to satisfy ourselves of subject-matter jurisdiction, even where the parties concede it. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 524, 541 (1986); *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996). Therefore, we must determine whether Urutyan's failure to comply with Rule 4(b) deprives this court of jurisdiction. We conclude that it does not.

The Supreme Court in three recent decisions has clarified when a party's failure to comply with a filing deadline deprives a lower federal court of subject-matter jurisdiction. In *Kontrick v. Ryan*, the Court held that a party's failure to comply with a filing deadline in the Bankruptcy Rules did not deprive the bankruptcy court of subject-matter jurisdiction. 540 U.S. 443, 459-60 (2004). Reasoning that "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction," the Court drew a distinction between statutory time constraints, which do limit subject-matter jurisdiction, and court-prescribed procedural rules, which do not. *Id.* at 452-53. The distinction matters because, while a "court's subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct; a [non-jurisdictional] claim-processing rule . . . even if unalterable on a parties' application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Id.* at 456.

The *Kontrick* Court was careful to address an apparent inconsistency with prior cases such as *United States v. Robinson*, 361 U.S. 220 (1960), wherein court-prescribed deadlines had been described as "mandatory and jurisdictional." *Kontrick*, 540 U.S. at 454 (quoting *Robinson*, 361 U.S. at 228-29). The Court observed that federal courts "have been less than meticulous in this regard; they have more than occasionally used the term 'jurisdictional' to describe emphatic time prescriptions in rules of court." *Id.* The Court stated that "[c]larity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only

for prescriptions delineating the classes of cases (subject matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Id.*

In *Eberhart v. United States*, the Court applied *Kontrick* to reverse a Seventh Circuit decision that held that a criminal defendant's failure to meet a filing deadline under the Federal Rules of Criminal Procedure deprived the district court of subject-matter jurisdiction. 546 U.S. 12 (2005). The Seventh Circuit, relying on both its own precedent and the Supreme Court's prior decision in *Robinson*, explained that "we have previously emphasized that [Rule 33's] 7-day period is jurisdictional, and that the court is without jurisdiction to consider even an amendment to a timely new trial motion if it is filed" out of time. *United States v. Eberhart*, 338 F.3d 1043, 1049 (7th Cir. 2004), *rev'd* 546 U.S. 12 (2005). In reversing, the Supreme Court analogized the time deadlines in the court-prescribed Federal Rules of Criminal Procedure to the Bankruptcy Rules, which the *Kontrick* Court held "are not jurisdictional, but are instead claim-processing rules, that may be unalterable on a party's application, but can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Eberhart*, 546 U.S. at 15 (quotations and citations omitted).

Acknowledging, as the *Kontrick* Court had, that prior cases like *Robinson* had characterized court-prescribed time deadlines as "mandatory and jurisdictional," the *Eberhart* Court again lamented the "imprecision" of the earlier use of the term "jurisdictional" to describe time prescriptions that, however inflexible and unalterable, nevertheless do not affect the subject-matter jurisdiction of lower federal courts. *Id.* at 18. Thus, the Court explained, "[t]he net effect of *Robinson*, viewed through the clarifying lens of *Kontrick*, is to admonish the Government that failure to object to untimely submissions entails forfeiture of the objection." *Id.*

Most recently, the jurisdictional nature of *statutory* time constraints was reaffirmed in *Bowles v. Russell*, 127 S. Ct.

2360, 2366 (2007). *Bowles* concerned a civil litigant's failure to file an appeal within the 14 days allowed under Federal Rule of Appellate Procedure 4(a)(6) when the time for appeal has been reopened. The district court judge had issued an order reopening the time for appeal for 17 days. Bowles's appeal was timely filed under the order, but not under Rule 4(a)(6). Dismissing the appeal, the Supreme Court observed that the deadline in Rule 4(a)(6) was underpinned by an identical deadline set forth in 28 U.S.C. § 2107(c). *Id.* The Court reasoned that, "[a]lthough several of our recent decisions have undertaken to clarify the distinction between claims-processing rules and jurisdictional rules, none of them calls into question our longstanding treatment of statutory time limits for taking an appeal as jurisdictional." *Id.* at 2364. Thus, Bowles's failure to comply with the deadline in Rule 4(a)(6) deprived the court of subject-matter jurisdiction because the deadline was also mandated by statute. *Id.* at 2366.

Here, Urutyan failed to comply with Appellate Rule 4(b), which sets filing deadlines for appeals in criminal cases. Like the Bankruptcy Rules at issue in *Kontrick* and the Federal Rules of Criminal Procedure at issue in *Eberhart*, Appellate Rule 4(b) is a court-prescribed, procedural rule. But, unlike Rule 4(a), which was at issue in *Bowles*, the rule is not back-stopped by any federal statutory deadline. Therefore, in light of the Supreme Court's holding that "[i]t is axiomatic that court-prescribed rules of practice and procedure, as opposed to statutory time limits, do not create or withdraw federal jurisdiction," *Kontrick*, 540 U.S. at 370, we conclude that the non-statutory time limits in Appellate Rule 4(b) do not affect subject-matter jurisdiction.[7]

---

[7]Every other circuit to address the question post-*Kontrick* has come to the same conclusion. *See United States v. Mitchell*, 518 F.3d 740, 744 (10th Cir. 2008); *United States v. Frias*, 521 F.3d 229, 234 (2d Cir. 2008); *United States v. Byfield*, 522 F.3d 400, 403 n.2 (D.C. Cir. 2008); *United States v. Martinez*, 496 F.3d 387, 388-89 (5th Cir. 2007); *United States v. Sadler*, 480 F.3d 932, 940 (9th Cir. 2007).

We are cognizant that, like many federal courts in the years preceding the Supreme Court's clarifying decisions in *Kontrick*, *Eberhart*, and *Bowles*, this court has been "less than meticulous" in our use of the term "jurisdictional" to describe timeliness requirements. *Kontrick*, 540 U.S. at 454; *see, e.g.*, *United States v. Little*, 392 F.3d 671, 680-81 (4th Cir. 2004) (characterizing Rule 4(b) as "jurisdictional"); *United States v. Schuchardt*, 685 F.2d 901, 902 (4th Cir. 1982) (same). However, "viewed through the clarifying lens of *Kontrick*," the term "jurisdictional" as used in these prior cases—and, prior to clarification of this issue, as it was used by the Supreme Court in *Robinson*—is best understood as referring to the emphatic nature of the time limits at issue, and not to any capacity of a non-statutory rule to restrict subject-matter jurisdiction. *See Eberhart*, 546 U.S. at 18.

Therefore, in light of *Kontrick*, *Eberhart*, and *Bowles*, we are satisfied that Urutyan's failure to comply with the non-statutory time limitations of Rule 4(b) does not divest this court of subject-matter jurisdiction over his appeal.[8]

### III.

Having satisfied ourselves that we have subject-matter jurisdiction over this appeal, we now turn to Urutyan's sole contention: that his Sixth Amendment right to counsel was

---

[8]This court's decision in *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385 (4th Cir. 2004) (en banc), is not to the contrary. In *Brickwood* we applied *Kontrick* to conclude that the safe harbor provisions of Federal Rule of Civil Procedure 11 do not implicate a district court's subject matter jurisdiction. *Id.* at 392. In dicta, and without the benefit of *Eberhart* and *Bowles*, we suggested that, even assuming Appellate Rule 4 could properly be characterized as "jurisdictional" in the sense that it demarcated district-court from circuit-court authority over a case, Rule 11 played no such role and could not, therefore, be so characterized. *Id.* at 393. We do not read *Brickwood* as reaching the question of whether the non-statutory time deadlines of Appellate Rule 4(b) implicate the subject matter jurisdiction of lower federal courts, which is the question we answer here.

denied when the district court disqualified one of his retained attorneys on conflict-of-interest grounds.[9] We review for abuse of discretion the district court's decision to disqualify a defendant's counsel of choice. *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996).

In *United States v. Wheat*, the Supreme Court explained that "[w]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." 486 U.S. 153, 159 (1988). The paramount concern is the judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160. Thus, a district court may disqualify a defendant's counsel of choice in spite of an express waiver by that defendant of any conflict of interest. *Id.* at 162.

In evaluating a district court's exercise of discretion, we are mindful that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict." *Id.* at 162. As a result, district courts "must be allowed substantial latitude in refusing waivers of conflict of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. Accordingly, "while recognizing 'a presumption in favor of petitioner's counsel of choice,' the *Wheat* Court found that such a 'presumption may be overcome not only by a demonstration of actual conflict but by a showing of a *serious potential for*

---

[9]Although no written waiver of conflict of interest appears in the record, Urutyan asserts that he "had indicated his willingness to waive any potential future conflict of interest." Appellant's Br. at 13.

*conflict.*'" *United States v. Basham*, No. 05-5, 2009 WL 806845, at *15 (4th Cir. Mar. 30, 2009) (citing *Wheat*, 486 U.S. at 164) (emphasis in *Basham*).

Here, the district court disqualified Graysen based on "a serious potential conflict" arising from "the great likelihood that Mr. Graysen was paid by a third party who is a member of the alleged criminal enterprise."[10] JA at 1070. Certainly, such an arrangement, if it existed, would create a serious potential for conflicts of interest. In *Wood v. Georgia*, the Supreme Court remarked on the "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." 450 U.S. 261, 268-69 (1981).[11] Here, the district court anticipated multiple potential conflicts, reasoning that "not only is it possible that Mr. Graysen is acting as an agent of a third party who has interests which are potentially in conflict with those of his client, but this fee arrangement may also discourage Urutyan

---

[10]The district court also identified a separate potential conflict based on Graysen's status as a "subject" of the government's ongoing investigation. Because we conclude that there was sufficient evidence for the district court to infer that Graysen was being paid by a coconspirator, and because such an arrangement would create a serious potential conflict of interest, we need not address this separate potential conflict.

[11]In *Wood*, the defendants, who faced charges of distributing obscenity materials, were represented by a lawyer who was hired and paid by the defendants' employer, the operator of an adult bookstore and theater. 450 U.S. at 263-64. Citing the potentially divergent interests of the defendants and their employer, the Court remanded for an inquiry into potential conflicts of interest. *Id.* at 273. Unlike here, remand was necessary in *Wood* because the issue was a post-conviction question of whether the defendants were deprived of effective assistance of counsel, a question that turned on whether there had been "an actual conflict . . . that affected counsel's performance—as opposed to a merely theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2001) (interpreting *Wood*). Here, however, the issue is whether, in the context of a pre-trial inquiry, a third-party fee arrangement poses a serious *potential* for conflict. *See Wheat*, 486 U.S. at 154, 164.

from considering a plea because more than likely a co-conspirator has paid his legal fees." JA at 1072. Further, the district court considered that "the Government may choose to establish the fraud conspiracy by showing the payment of $85,000 in cash to Mr. Graysen, which would result in Mr. Graysen becoming a potential witness against his client." *Id.* Any of these scenarios would pose an unwaivable conflict of interest, and it was therefore well within the district court's substantial latitude to conclude that Graysen's representation posed a serious potential for conflict of interest. *See Wheat*, 486 U.S. at 164.

The only remaining question is whether there was a sufficient evidentiary basis from which to conclude that Graysen was hired and paid by a member of the alleged criminal conspiracy. We conclude that there was. The record shows that a codefendant informed Urutyan by telephone that "they said to write you and let you know that you have a lawyer . . . someone from California" and that she "gave it all to them . . . [and] they will sort of pay for the lawyer . . . they will give it back to you and the remains will be paid to the lawyer." JA at 978. Graysen, a California lawyer, informed the district court that he was hired less than two weeks after the telephone conversations took place by a man who identified himself only as "David" and refused to provide a last name, address, or phone number. Graysen stated that David paid him $25,000 in cash to represent Urutyan and gave him an additional $60,000 in cash to hire representation for Urutyan's three codefendants. The district court also considered evidence of Graysen's questionable behavior, including his failure to deposit the $25,000 in a bank account, his failure timely to report receipt of the cash to the IRS, and his failure to enter a written retainer agreement. We agree with the district court that the telephone conversations "strongly indicate that Mr. Graysen was paid with proceeds illegally gained by a member of the alleged fraud conspiracy," and that the dubious circumstances of the payment arrangement "all support

the inference that David is a member of the alleged fraud scheme." JA at 1071.

Having concluded that the district court had a sufficient evidentiary basis from which to conclude that Urutyan's lawyer was hired and paid by a member of the alleged criminal conspiracy, and having further determined that such an arrangement posed a serious potential for conflict of interest, we hold that the district court did not abuse its discretion in disqualifying Graysen as counsel.

## IV.

For the foregoing reasons, the decision below is

*AFFIRMED*.