<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1726**

UNITED STATES OF AMERICA ex rel. PAUL R. BLACK,

Plaintiff - Appellant,

v.

HEALTH & HOSPITAL CORPORATION OF MARION COUNTY,

Defendant – Appellee,

and

DOUGLAS L. ELWELL; MATTHEW R. GUTWEIN; MYERS AND STAUFFER LC,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Richard D. Bennett, District Judge. (1:08-cv-00390-RDB)

Argued:  May 18, 2012            Decided:  August 17, 2012

Before AGEE, DAVIS, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Barry Coburn, COBURN & GREENBAUM, PLLC, Washington, D.C., for Appellant.  Jessica Lynn Ellsworth, HOGAN LOVELLS US LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Jonathan L. Diesenhaus, Thomas J. Widor, HOGAN LOVELLS US LLP, Washington,

D.C.; Joseph H. Young, HOGAN LOVELLS US LLP, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Relator Paul R. Black appeals the district court's dismissal of his Amended Complaint, alleging various claims under the False Claims Act, 31 U.S.C. §§ 3729, et seq. (the "FCA"). The district court held that it did not possess subject matter jurisdiction over Black's claims, and even if it did possess jurisdiction, the Amended Complaint failed to state a claim under the Federal Rules of Civil Procedure. Black also challenges the district court's denial of his request for leave to file a Second Amended Complaint. Because we agree that the district court lacked subject matter jurisdiction pursuant to the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A), we affirm without reaching the alternate grounds for dismissal. We also affirm the district court's denial of Black's request for leave to file a Second Amended Complaint.

I.

A.

On February 12, 2008, Relator Black filed this FCA qui tam action in the United States District Court for the District of Maryland against Appellee Health and Hospital Corporation of Marion County, Indiana ("HHC"), a municipal corporation and political subdivision of the State of Indiana that owns and

3

operates nursing home facilities.[1]  See J.A. 8-73.[2]  Although the government declined to intervene in this action, Black proceeded individually pursuant to 31 U.S.C. § 3730(b)(4)(B).  He then filed an Amended Complaint on August 23, 2010, which alleges a scheme orchestrated by HHC in which Medicaid reimbursements were fraudulently obtained for nursing home expenditures that HHC never made.  See id. at 100-57.

Specifically, the Amended Complaint includes four counts:

> Count I, that HHC caused state Medicaid agencies to submit factually false claims to the Centers for Medicare and Medicaid Services ("CMS"), in violation of 31 U.S.C. § 3729(a)(1);[3]
>
> Count II, that HHC caused state Medicaid agencies to submit legally false claims to CMS, in violation of 31 U.S.C. § 3729(a)(1);

---

[1] This is the second qui tam action Black, an attorney licensed in Indiana, has filed against HHC.  He filed the first in the United States District Court for the Southern District of Indiana in October 2003.  After he amended his complaint once in Indiana and the government declined to intervene, he dismissed that action without prejudice.

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] The subsections under which these claims arose were re-numbered in May 2009.  At the time that Black's initial Complaint was filed, § 3729(a)(1) provided that a person could be held liable for a civil penalty and treble damages if he or she "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval[.]"  31 U.S.C. § 3729(a)(1) (2006), amended May 2009.

4

Count III, that HHC made and used, and caused to be made and used, false records and statements to get false or fraudulent claims paid or approved by the government, in violation of 31 U.S.C. § 3729(a)(2);[4] and

Count IV, that HHC entered into a conspiracy to defraud the government, in violation of 31 U.S.C. § 3729(a)(3).[5]

J.A. 153-55. The following excerpt from Black's Amended Complaint summarizes the allegations of HHC's wrongdoing:

> Congress has made federal taxpayer funds available to help states provide medical care to their poorest citizens. But Congress requires a basic commitment in return — each state must use its own funds to pay its fair share of those Medicaid expenses. The federal government reimburses approximately 62% of Indiana's Medicaid expenditures. In order to qualify for that 62% reimbursement, the State of Indiana must spend the other 38% from its own funds on actual care for Medicaid recipients. . . .
>
> In 2001, HHC persuaded Indiana Medicaid officials to tell the federal government that Indiana was spending an extra $57 per day on all Medicaid patients living in county nursing homes. Since 2001, HHC has given Indiana Medicaid officials pieces of paper saying that HHC had spent enough money on nursing home

---

[4] Subsection (a)(2) provided that a person could be held liable for a civil penalty and treble damages if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]" 31 U.S.C. § 3729(a)(2) (2006), amended May 2009.

[5] Subsection (a)(3) provided that a person could be held liable for a civil penalty and treble damages if he or she "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[.]" 31 U.S.C. § 3729(a)(3) (2006), amended May 2009.

5

patients to cover Indiana's share of that extra $57 per patient per day on all county nursing homes in the state, and was doing "intergovernmental transfers" to the state of Indiana matching those amounts. Indiana Medicaid officials then gave HHC pieces of paper saying that the state was returning the money to HHC. In fact, HHC had not spent any substantial extra money on the patients in its nursing homes.

Relying on Indiana's false claims that it had used state funds to pay its share of an extra $57 per patient per day for Medicaid patients in county nursing homes, the federal government reimbursed Indiana 62% of those claimed expenditures, amounting to hundreds of millions of dollars in unwarranted federal reimbursements since 2001. Indiana then shared that extra federal money with HHC. Neither Indiana nor HHC spent a substantial percentage of that extra federal money on patient care for nursing home residents, as required by law[.]

J.A. 100-101.

On November 19, 2010, HHC filed a Motion to Dismiss, arguing (1) the court lacked subject matter jurisdiction under the FCA pursuant to the "public disclosure bar," 31 U.S.C. § 3730(e)(4), and Federal Rule of Civil Procedure 12(b)(1); (2) venue was improper in the District of Maryland, pursuant to Rule 12(b)(3); and (3) the Amended Complaint failed to state a claim under the FCA, pursuant to Rules 12(b)(6) and 9(b). See Mem. Supp. Motion to Dismiss at 15, United States ex rel. Black v. Health & Hosp. Corp., No. 1:08-cv-00390 (D. Md. Feb. 12, 2008; filed Nov. 19, 2010), ECF No. 30-1. Black responded on January 3, 2011, and also filed a separate "Motion to Defer Potential Motion for Leave to Amend Until Resolution of Motion to Dismiss"

6

(hereinafter, "Motion to Defer"). The motion asked the court to "defer the period for him to move to amend until after the Court resolves the Motion to Dismiss" and stated, "the Court will be in a better position to evaluate any motion for leave to amend . . . after it has decided HHC's pending Motion to Dismiss." Mem. Supp. Motion to Defer at 2, Black, No. 1:08-cv-00390 (D. Md. Feb. 12, 2008; filed Jan. 3, 2011), ECF No. 33-1.

On March 28, 2011, the district court dismissed the Amended Complaint with prejudice and denied the Motion to Defer. See United States ex rel. Black v. Health & Hosp. Corp., No. RDB-08-0390, 2011 WL 1161737 (J.A. 559-84) (D. Md. Mar. 28, 2011) (the "District Court Opinion"). First, the court held that subject matter jurisdiction was lacking under Federal Rule of Civil Procedure 12(b)(1) based on the FCA's jurisdictional public disclosure bar. Second, the court explained that even if it possessed subject matter jurisdiction, the Amended Complaint could also be dismissed under Rules 12(b)(6) or 9(b).[6] See J.A. 8-24.

On April 11, 2011, Black filed a Motion for Leave to File Second Amended Complaint, along with a Motion for

_____

[6] The District Court Opinion did not address the venue argument. Although we have doubts about the reasoning proffered by Black on this point at the district court level, we assume without deciding that venue was proper in the District of Maryland.

7

Reconsideration of the court's denial of his Motion to Defer. The court denied both on June 15, 2011.  See J.A. 720-25.

B.

1.

The backdrop to Relator Black's Amended Complaint involves the interplay between state and federal funding of the Medicaid program.  Medicaid is a state-administered health care program for low-income individuals, but the federal government contributes varying costs, depending on the state.  See Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006); 42 U.S.C. § 1396, et seq.  The program is regulated by the Secretary of the United States Department of Health and Human Services, who acts through CMS.  See Ahlborn, 547 U.S. at 275.

In order to receive federal funds for Medicaid, a state must create a "State plan."  42 U.S.C. § 1396a.  The State plan is "a comprehensive written statement . . . describing the nature and the scope of [the state's] Medicaid program and giving assurance that it will be administered in conformity" with the applicable federal laws and regulations.  42 C.F.R. § 430.10.  CMS reviews each plan to determine whether it can be approved "to serve as a basis for Federal financial participation (FFP) in the State program."  Id.

Once a State plan is submitted and approved by CMS, the state can receive federal reimbursement for "an amount equal to the Federal medical assistance percentage . . . of the total amount expended . . . as medical assistance under the State plan," 42 U.S.C. § 1396b(a)(1), also known as the "FMAP." 42 C.F.R. § 400.203. Each state must provide a prospective quarterly estimate of its anticipated Medicaid expenditures, and CMS uses that number and the FMAP to calculate the federal funds due to the state. See id. § 430.30 (a)–(d).

For years, state governments have utilized various funding mechanisms to maximize their state Medicaid expenditures in order to obtain an increased federal match, and three such mechanisms are relevant to this appeal. First, the upper payment limit mechanism ("UPL") allows states to reimburse health care facilities for uncompensated care, but reimbursement is limited to the amount that the Medicare program would have paid for the same services. See 42 C.F.R. § 447.272(b). Second, states can receive intergovernmental transfers ("IGTs") from local governments, usually in the form of taxes, which can then qualify for federal matching funds. IGTs "allow units of local government, including government health care providers, to share in the cost of the State Medicaid program." 72 Fed. Reg.

2236, 2238 (Jan. 18, 2007).[7]  Finally, states also utilize certified public expenditures ("CPEs"), which allow Medicaid providers to make direct Medicaid expenditures that qualify as part of the state's share for federal matching funds.  CPEs must be "certified by the contributing public agency as representing expenditures for FFP[.]"  42 C.F.R. § 433.51(b).

In the early 2000s, the Medicaid funding landscape changed when Congress adopted a system that would set new UPLs on overall aggregate payments to Medicaid providers by class (e.g., state government-owned, local government-owned, or private entities), rather than by provider.  See 66 Fed. Reg. 3148 (Jan. 12, 2001); Alameda County Med. Cntr. v. Leavitt, 559 F. Supp. 2d 1, 2 (D.D.C. 2008) (explaining that CMS had "refined a system based on [UPLs], with reimbursements calculated using aggregate, and not provider-specific, cost data").  The revisions were meant to limit the ability of the states to

---

[7]  IGTs are authorized by the Social Security Act. Specifically, the Social Security Act provides that "the Secretary may not restrict States' use of funds where such funds are derived from State or local taxes . . . transferred from or certified by units of government within a State as the non-Federal share of [Medicaid] expenditures . . . regardless of whether the unit of government is also a health care provider[.]"  42 U.S.C. § 1396b(w)(6)(A).  Indeed, Indiana law requires that "[e]ach governmental transfer or other [Medicaid] payment mechanism . . . must maximize the amount of federal financial participation that the state can obtain through the [IGT] or other payment mechanism."  Ind. Code § 12-15-14-1(c).

manipulate UPL/IGT mechanisms in order to increase receipt of federal matching funds.  See 67 Fed. Reg. 2602 (Jan. 18, 2002).

However, because the UPL scheme came to be defined in the class aggregate, rather than by Medicaid provider, it was possible for a provider to receive an amount in excess of its former "individual UPL," as long as the overall "class UPL" was not exceeded.  Because Medicaid is generally funded at a lower rate than Medicare, states often had an excess of funds, or a "UPL Gap," from which to distribute monies to Medicaid providers of their choice.  In practical terms, a state could make a "supplement payment" to any provider in a class and could structure that payment so that it would be funded in part by federal matching funds and in part by state funds.  It could then recoup that payment through an IGT from the same provider. This method was permissible under the new regulations.

2.

CMS repeatedly and publicly expressed concern with the UPL/IGT financing scheme used by the states to take advantage of aggregate UPLs, beginning at least as early as 2000.  In 2007, CMS sought to issue a new regulation that would have significantly curtailed the states' use of the UPL/IGT scheme by returning to a system of reimbursement on a cost-to-provider basis.  See 72 Fed. Reg. 2236 (Jan. 18, 2007) (the "2007

11

Proposed Rule").[8]  The 2007 Proposed Rule was never adopted.  In fact, Congress enacted a one-year moratorium on the issuance of the rule or any rule like it.  See Leavitt, 559 F. Supp. 2d at 2.

During the time leading up to the introduction of the 2007 Proposed Rule and thereafter, however, public debate on this issue thrived.  Congress held numerous public hearings on the subject.  See, e.g., Upper Payment Limits: Federal Medicaid Spending for Non-Medicaid Purposes, Hearing Before S. Comm. On Finance, 106th Cong. 1-2 (Sept. 6, 2000) (statement of Sen. William V. Roth, Jr., Chairman) (describing the use of UPL payments as a "complicated accounting mechanism" that "tak[es] advantage of a loophole" in the applicable federal regulations); id. at 3 (statement of Sen. John Breaux) ("[M]y State has found out that this procedure, in fact, is not illegal, and therefore, is legal and has filed an application to do what, apparently, 19 other States currently are doing, and 14 states, in addition to

---

[8] The "Background" section of the 2007 Proposed Rule states, "We have found instances in which the State or local government has used the funds returned by the health care provider for costs outside the Medicaid program or to help draw additional Federal dollars for other Medicaid program costs.  The Government Accountability Office (GAO) and the Department of Health and Human Services Office of Inspector General (OIG) have reviewed these practices and shared our concerns that they are not consistent with Medicaid financing requirements."  72 Fed. Reg. at 2238.

12

mine, have applications, in fact, to do."). Legislative reports addressed the same. See, e.g., Elicia J. Herz, Cong. Research Serv., RL31021, Medicaid Upper Payment Limits and Intergovernmental Transfers: Current Issues and Recent Regulatory and Legislative Action (2005); U.S. Gov't Accountability Office, GAO-02-147, Medicaid: HCFA Reserved Its Position and Approved Additional State Financing Schemes (2001).

Indiana media outlets also featured these issues. See, e.g., Art Lodgson, Editorial: Medicaid Patients at Risk from State's Budget Knife, The Indianapolis Star, Mar. 11, 2002, at A9 (J.A. 400-01); Nursing Homes, Medicaid Make Deal, Evansville Courier & Press, Mar. 12, 2002, at B3 (J.A. 403). In fact, Indiana's Medicaid financing scheme drew national attention when the New York Times highlighted a dispute between Indiana and CMS over Marion County's IGTs. See Robert Pear, U.S. Nears Clash with Governors on Medicaid Cost, N.Y. Times, Feb. 16, 2004 (J.A. 405).

C.

In his Amended Complaint, Black alleges that HHC executives and officials at the Office of Medicaid Policy and Planning ("OMPP"), the Indiana state agency responsible for administering the state Medicaid program, acted "in concert" to draft a proposed amendment to the Indiana State Plan. Am. Compl. ¶ 51. This amendment, Black claims, "was designed to

13

appear to take advantage of the Medicaid UPL Regulation that permits state Medicaid agencies to claim and receive . . . additional [UPL payments], provided that the state actually expended such amounts on nursing facility care." Id. ¶ 52 (emphases in original).

The amendment to the State Plan about which Black complains was approved by CMS. Nonetheless, Black claims that "under the fraudulent scheme entered into between HHC and OMPP, no expenditures were actually made by OMPP and, ultimately, only CMS paid any part toward the supposed supplemental UPL Medicaid Payments." Am. Compl. ¶ 63. Black says that, as part of this "scheme," "HHC avoided having OMPP make any actual expenditures simply by having OMPP falsely . . . claim . . . amounts that OMPP 'certified' it had 'spent,' and/or amounts that were purportedly transferred to OMPP by means of [IGTs], which were subsequently 'transferred' back from OMPP to HHC, rather than 'spent.'" Id. ¶ 64.

Black also claims that HHC and OMPP entered into a "[s]ecret" written agreement in February 2002 to "unlawfully obtain FFP for UPL payments[.]" Am. Compl. ¶ 92. This agreement shows, he says, that HHC provided "false certification" that its "funds" constituted "expenditures" under the Social Security Act, but an expenditure "cannot be merely a refund or reduction in accounts receivable." Id. ¶ 98-99.

14

Black further claims that "OMPP's use of HHC's purported IGTs as a basis for the UPL Medicaid payments violates OMPP's commitment in the State Plan that only state funds are used to pay all of the non-federal share of the total expenditures." Id. ¶ 106. Likewise, he claims that HHC reported "contrived" CPEs in violation of CMS's policies set forth in the 2007 Proposed Rule. Id. ¶ 102.

The district court dismissed Black's Amended Complaint pursuant to the FCA's jurisdictional "public disclosure bar," 31 U.S.C. § 3730(e)(4)(A). The purpose of the public disclosure bar is "to prevent lawsuits by private citizens [when] th[e] [relevant] authority is already in a position to vindicate society's interests, and a qui tam action would serve no purpose." Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 913 (7th Cir. 2009) (internal quotation marks omitted). This is because, where a public disclosure has occurred, "the critical elements exposing the [alleged fraud]" are already placed in the public domain. Id. (internal quotation marks omitted).

At the time the Amended Complaint was filed, the public disclosure bar provided,

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Account[ability] Office report, hearing, audit, or investigation, or from the news media, unless the

15

action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (2006), amended March 23, 2010.[9]

---

[9] The statute was later amended to provide,

The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed —

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4). The Supreme Court has observed that the new statute lacks the explicit language that would make it retroactive. See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, ___ U.S. ___, 130 S. Ct. 1396, 1400 & n.1 (2010). Even if it would apply retroactively, however, as explained infra, Black's claim still does not survive under the narrower reading adopted by this court prior to March 23, 2010.

16

In invoking the public disclosure bar to dismiss this action, the district court found that Black's allegations in the Amended Complaint "largely mimic the public criticism of the UPL/IGT Medicaid financing mechanisms that have been the subject of great debate within CMS, Congress, the GAO, and elsewhere since at least as early as 2000." District Court Opinion 13. It also observed that many of Black's concerns with Indiana and HHC's Medicaid financing schemes "are substantially similar to [the] 2007 Proposed Rule[.]" Id. at 14.

## II.

As an initial matter, we are "obliged to satisfy ourselves of subject-matter jurisdiction[.]" United States v. Urutyan, 564 F.3d 679, 684 (4th Cir. 2009). See also Wye Oak Tech., Inc. v. Republic of Iraq, 666 F.3d 205, 218 (4th Cir. 2011) ("[A] federal court has an independent obligation to assess its subject-matter jurisdiction." (internal quotation marks omitted)). Federal district courts are "courts of limited subject matter jurisdiction" and "possess only the jurisdiction authorized them by the United States Constitution and by federal statute." Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009).

When a defendant challenges the existence of subject matter jurisdiction in fact, "the plaintiff bears the burden of proving the truth of such facts by a preponderance of the

17

evidence." Vuyyuru, 555 F.3d at 347. We review a district court's jurisdictional findings of fact "on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims" for clear error. Id. at 348. We review "any legal conclusions flowing therefrom" de novo. Id.

Under the clearly erroneous standard of review, the fact that this court may have decided the case differently is an insufficient basis to overturn a finding of fact. See Easley v. Cromartie, 532 U.S. 234, 242 (2001). We will only overturn a court's finding of fact as clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

When reviewing a district court's denial of a motion for leave to amend a complaint, we employ an abuse of discretion standard. See Nolte v. Capital One Fin. Corp., 390 F.3d 311, 317 (4th Cir. 2004).

III.

A.

In adopting the FCA, Congress intended "to protect the funds and property of the Government from fraudulent claims[.]"

18

<u>Rainwater v. United States</u>, 356 U.S. 590, 592 (1958).  This court has explained,

> [The FCA's] roots lie in the rampant fraud perpetrated by contractors against the government during the Civil War, and it has served ever since as a safeguard against unscrupulous government contractors.  The cornerstone provision of the FCA prohibits any person from presenting a false or fraudulent claim for payment or approval to the United States.

<u>Mann v. Heckler & Koch Def., Inc.</u>, 630 F.3d 338, 342-43 (4th Cir. 2010) (internal citations and quotation marks omitted).  See also <u>United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.</u>, 612 F.3d 724, 728 (4th Cir. 2010).  FCA actions may be brought by the Attorney General or by a private party.  <u>See</u> 31 U.S.C. § 3730(a), (b).  If a private party, commonly known as a "relator," brings the claim, it is known as a "<u>qui</u> <u>tam</u>" action, and the relator acts "in the name of the United States."  <u>Mann</u>, 630 F.3d at 343.  A relator may recover up to thirty percent of the proceeds of a successful action, plus attorney's fees and costs.  <u>See</u> 31 U.S.C. § 3730(d).  The relator files his or her complaint under seal and notifies the government, and the government will either intervene or allow the relator to proceed alone.  <u>Id.</u> § 3730(b), (c).  The public disclosure bar was enacted to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits[.]"  <u>Graham Cnty. Soil & Water</u>

19

Conserv. Dist. v. United States ex rel. Wilson, ___ U.S. ___, 130 S. Ct. 1396, 1407 (2010).

B.

In an FCA action, when subject matter jurisdiction is challenged under the public disclosure bar, a court must engage in a three-pronged analysis to determine (1) if there was a public disclosure, (2) if the relator's allegations were "based upon" the public disclosure, and, if so, (3) whether the relator is nonetheless "entitled to original source status" as "'an individual who has direct and independent knowledge of the information on which the allegations [] are based[.]'" United States ex rel. Wilson v. Graham Cnty. Soil & Water Conserv. Dist., 528 F.3d 292, 299 (4th Cir. 2008), rev'd on other grounds, Graham Cnty., 130 S. Ct. at 1411; Vuyyuru, 555 F.3d at 348 (quoting 31 U.S.C. § 3730(e)(4)(B) (2006)).[10]

1.

First, we must determine if the district court erred in concluding that a public disclosure occurred. The pre-March 2010 public disclosure bar is triggered by "the public

_____

[10] Because the factual issues regarding the FCA's public disclosure bar concern issues that are not intertwined with the facts central to Black's FCA claims, the district court was entitled to go beyond the allegations of the Amended Complaint and consider evidence outside the pleadings, including Black's statements in his sworn declaration filed on January 3, 2011. See Vuyyuru, 555 F.3d at 348-50; J.A. 495-501.

20

disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or from the news media[.]" 31 U.S.C. § 3730(e)(4)(A) (2006); <u>United States ex rel. Grayson v. Advanced Mgmt. Tech., Inc.</u>, 221 F.3d 580, 582 (4th Cir. 2000). The district court found that this requirement was satisfied, explaining,

> CMS, the agency charged with administering the Medicaid program, has publicly expressed its concern with the individual states' use of UPL and IGT financing mechanisms to leverage Federal Match funding from at least as early as 2000. As a result, the CMS and GAO engaged in a lengthy and systematic review of the state Medicaid financing programs. As part of this review, the CMS Administrator specifically noted that Indiana was among seven states that have worked cooperatively with [CMS] either to remove new recycling features or terminate existing recycling provisions in the future. While these disclosure [sic] did not specifically identify the Defendant HHC, they clearly show that the government was aware of the Medicaid financing schemes being utilized by the states in general, and Indiana in particular[.]

District Court Opinion 11-12 (internal quotation marks and citations omitted).

Black contends that "[t]he district court did not attempt to parse in detail the alleged similarity between the general observations about Medicaid reimbursement made by the GAO and Congress, as compared with the highly specific allegations" made in the Amended Complaint. Br. of Appellant 16. The district court was not required to do so. There is no

21

requirement under our case law that the public disclosure matches with specificity the allegations made by a qui tam relator. Indeed, the Supreme Court has recognized that the first prong of the public disclosure bar is satisfied if the disclosure "put[s] the Federal Government on notice of a potential fraud." Graham Cnty., 130 S. Ct. at 1404.

Since Graham County, this court has held in an unpublished opinion that SEC forms were "public disclosures" because, even though they "[did] not necessarily alert federal agencies to wrongdoing, [they] certainly provide[] easily accessible notice of [] transactions . . . from which an investigation could have begun or developed." United States ex rel. Jones v. Collegiate Funding Servs., No. 11-1103, 2012 WL 835747, at *10 (4th Cir. Mar. 14, 2012). Other courts have likewise held that public disclosures need not match the specificity of the FCA allegations. See, e.g., United States ex rel. Gear v. Emergency Med. Assocs. of Ill., 436 F.3d 726, 729 (7th Cir. 2006) (citing GAO reports and medical news reports about improper Medicare billing as examples of public disclosures, even when they did not name the FCA defendant); United States ex rel. Gilligan v. Medtronic, Inc., 403 F.3d 386, 389 (6th Cir. 2005) ("[W]e do not require specific disclosure of fraud to find public disclosure.").

Furthermore, since at least 2000, there has been a robust public discussion about the propriety of the UPL/IGT mechanism. As the district court acknowledged, CMS, a government agency, publicly relayed perceived deficiencies with the UPL/IGT mechanism throughout the country and, specifically, in Indiana. See District Court Opinion 11-12. The discussion was manifested in GAO reports, congressional reports and hearings, and in various forms of news media. These items fall directly within the confines of the public disclosure bar statute, and as a result, they were sufficient to "put the Federal Government on notice of a potential fraud." Graham Cnty., 130 S. Ct. at 1404.

Therefore, the district court did not err in finding that a public disclosure occurred.

2.

Second, we address whether the district court erred in finding that Black's allegations underpinning his FCA claims were "based upon" public disclosures.

Before the 2010 revisions to the public disclosure bar, the "based upon" language of (e)(4)(A) was construed more narrowly in the Fourth Circuit than in other courts. In Siller v. Becton Dickinson & Co., the court held that "a relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the

23

allegations upon which his qui tam action is based." 21 F.3d 1339, 1348 (4th Cir. 1994) (emphasis added). See also United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 57 (1st Cir. 2009) ("[T]he Fourth Circuit [is] alone among the courts of appeals in favoring a narrow reading of the 'based upon' language."). However, in 2009, this court held that the public disclosure bar "encompasses actions even partly based upon prior public disclosures." Vuyyuru, 555 F.3d at 351-52 (emphasis added).

Black's Amended Complaint — at the very least — encompasses actions partly based on public disclosures. The district court found that the Amended Complaint "essentially parrot[s]" the concerns outlined in the 2007 Proposed Rule; "tracks the public debate surrounding the issue"; and "borrows heavily from CMS' publicly disclosed concerns with the UPL/IGT program." District Court Opinion 14-15. These findings are not clearly erroneous.

First, the Amended Complaint reflects the core of the 2007 Proposed Rule and other public disclosures. For example,

- Black alleges that UPL payments to Indiana were impermissible because the state did not actually expend such amounts of nursing care under Medicaid. See Am. Compl. ¶ 52, 63-64. The 2007 Proposed Rule provides similarly. See 72 Fed. Reg. at 2236-40. See also J.A. 290, 292 (Office of Inspector General Memorandum) (explaining that, in conducting audits of six states, the OIG found "the enhanced payments to local government-

24

owned providers were not based on the actual cost of providing services to Medicaid beneficiaries" and recommending that states "must demonstrate that . . . payments were actually made available to the facilities and the facilities used the fund to furnish Medicaid approved services").

- Black alleges that HHC's IGTs or CPEs were "merely a refund or reduction in accounts receivable." Am. Compl. ¶ 99. This same sentiment was echoed in public documents. See, e.g., J.A. 291 (Office of Inspector General Memorandum) ("[Use of UPL Gap funds for IGTs] draws into question whether the amounts returned to the State agencies constitute a refund required to be reported as other collections[.]").

- Black alleges that HHC's IGTs or CPEs were not in compliance with the 2007 Proposed Rule. Am. Compl. ¶ 100-04 (citing 2007 Proposed Rule, 72 Fed. Reg. 2236-01).

- Black alleges that the source of IGTs were not state and local tax revenue, as required under the Indiana State Plan. See Am. Compl. ¶ 106-07. The 2007 Proposed Rule similarly provides, "the State must be able to demonstrate [] [t]hat the source of the [IGTs] is State or local tax revenue[.]" 72 Fed. Reg. 2236.

Moreover, Black's own sworn declaration undercuts his argument. He admits that before he filed his initial complaint in this court, he "reviewed the 2007 CMS proposal to adopt new regulations related to IGTs, CPEs, and UPL financing arrangements" and used it to "help[] [him] better articulate" his legal theory. J.A. 500. For these reasons, the district court did not clearly err in its decision on the second prong.

25

Finally, Black's last opportunity to survive HHC's motion to dismiss is to prove that he is entitled to "original source" status. In order to achieve original source status, Black must prove beyond a preponderance of the evidence that he has "direct and independent knowledge of the information on which his allegations are based and has voluntarily provided the information to the Government[.]" 31 U.S.C. § 3730(e)(4)(B) (pre-March 2010). A relator's knowledge is "direct" if "he acquired it through his own efforts, without an intervening agency," and it is "independent" if "the knowledge is not dependent on public disclosure." Grayson, 221 F.3d at 583 (internal quotation marks omitted).

Black has simply not put forth the evidence necessary to prove that he is an original source of the information in his Amended Complaint. In this regard, he proffered that he contacted Bob Decker, a client who "had considerable experience with Indiana nursing homes, and is a smart man." J.A. 496. According to Black, they discussed the UPL/IGT mechanism at length, and Decker supplied Black with documents concerning the Medicaid financing arrangements between HHC and Indiana. Id. at 496-97. Black says he also spoke with a woman named Faith Laird, who said she had "recorded a statement from a nursing home operator admitting that he had received a cash payout from

HHC as a share of the extra FFP HHC has received" and had "written out a 'conspiracy chart'" related to the UPL scheme. Id. at 498.

Moreover, Black's purported status as the "original source" must rest on more than a guessing game. As explained in Vuyyuru, a person's "mere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry his burden of proving that he is entitled to original source status." 555 F.3d at 353. Yet Black admitted in his initial Complaint that he never had "access to all the books and records of Defendants that may be relevant to this action" and was therefore not "in a position to identify, in all cases, all the specific documents used to make the false or fraudulent claims[.]" Compl. ¶ 24 (J.A. 14). Rather, he explains that, "I knew in my gut that HHC's UPL deal with the State was illegal." J.A. 498. This is not enough. Due to the "glaring lack of evidence" of Black's direct and independent knowledge, Vuyyuru, 555 F.3d at 354, we affirm the district court's decision on the original source issue.

We therefore affirm the district court's dismissal of this claim under the public disclosure bar.[11]

---

[11] Because we agree with the court's decision on the public disclosure bar, we need not reach the alternative ground for
(Continued)

27

Black also asks us to reverse the district court's denial of his request for leave to file a Second Amended Complaint. First, he filed the Motion to Defer on January 3, 2011, and then, the Motion for Leave to File Second Amended Complaint and Motion for Reconsideration of the court's denial of the Motion to Defer on April 11, 2011. The court denied all three, and Black argues that the court erred in doing so. We find his arguments to be without merit.

Black admits that "[t]his issue arose in a somewhat unusual procedural posture" in his filing of the Motion to Defer, but he argues that his motion "was tantamount to making a standard request for leave to amend if the motion to dismiss was granted." Br. of Appellant 21. We disagree. As the district court explained, "this unusual request certainly runs afoul of its purpose, which is to 'provide the district court with a means by which to determine whether the amendment would cure the defects in the initial complaint.'" District Court Opinion 24 (quoting Francis v. Gaicomelli, 588 F.3d 186, 197 (4th Cir. 2009)).

_____

dismissal under Rules 12(b)(6) and 9(b). See Schramm, Inc. v. Shipco Transp., Inc., 364 F.3d 560, 566 n.2 (4th Cir. 2004).

28

Turning to the denial of Black's Motion to Amend and Motion for Reconsideration on April 11, 2011, the district court correctly noted that these motions are essentially "moving this Court to reconsider its dismissal of the complaint." J.A. 722. The court had already ruled that after "four[] iteration[s]" of his complaint, Black still failed to provide allegations sufficient to survive a motion to dismiss, and that further amendments would be futile. District Court Opinion 25. Indeed, the Supreme Court has held that "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment" are acceptable grounds for denying a request for leave to amend the complaint. Foman v. Davis, 371 U.S. 178, 182 (1962). The district court did not abuse its discretion in denying the motions.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

29